[L. A. No. 28455.   In Bank.   Feb. 17, 1966.]

THOMAS W. LEFNER, Petitioner, v. THE STATE BAR
OF CALIFORNIA, Respondent.

Thomas W. Lefner, in pro. per., and Joseph R. Carter, Jr., for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—Petitioner was charged with misappropriating funds belonging to several clients. The Board of Governors of the State Bar found four of the charges true, dismissed a fifth charge and, based on the charges found to be true, recommended that petitioner be disbarred.

Petitioner was admitted to practice in 1953, and has no prior disciplinary record.

The evidence can be summarized as follows:

1. *Matter of Nichols*: The evidence on this charge consisted of the transcripts of a civil proceeding brought by the executor of the estate of Nichols against petitioner for conversion and for money had and received. The court in that action found that petitioner had secured over $7,000 from Nichols

by fraudulent means, and entered its judgment accordingly. These transcripts were introduced by stipulation of the parties. They show that at the times here involved Nichols, who was 80 and nearly blind, lived alone, his wife having recently died. Nichols signed a printed retainer agreeing to pay petitioner $3,000 for attending to all matters in connection with his wife's estate. On February 9, 1961, petitioner requested and obtained a check from Nichols for $1,268.54, as a downpayment on his fee. Four days later he obtained an additional $2,835 from Nichols' bank account on Nichols' authorization. The authorization had originally been for $1,835, but petitioner raised it to $2,835, and had Nichols initial the change. The authorization instructed the bank to "disburse the amount of $2,835.00 as payment in full of all attorney fees and expenses in connection with the affairs of the estate of Margaret Nichols."

Petitioner testified that he had originally prepared the authorization for $1,835 to pay off the $3,000 retainer and to secure $103 for Nichols as pocket money. He testified that all but about $1,100 of the funds he had received were part of his fee, but that he kept all the money together in his filing cabinet in cash in an envelope he could not remember marking.

On February 24, 1961, petitioner obtained an additional $3,450 from Nichols' bank account, again with Nichols' authorization. The amount had been raised from $1,450 to $3,450, and Nichols again initialed the change. The authorization stated that it was "in payment of money due on account." Petitioner admitted that nothing was due on account at that time. He also kept these funds in cash in the filing cabinet.

Petitioner testified that after Nichols had expressed dissatisfaction over his fee, he told Nichols that he would keep the downpayment ($1,268.54) and refund "all of his money to him, part of which belonged to him anyway." Petitioner claimed that he then delivered $6,285 in cash to Nichols at his home and obtained a receipt therefor. His testimony regarding return of the money was corroborated by one Jean Grecco, an employee of a travel agency in which petitioner had a partnership interest, who had accompanied petitioner to Nichols' home as a witness. The receipt was signed by Nichols. The last digit in its date, February 28, 1961, contains an obvious erasure.

Robert Vandegrift, an attorney and a friend of Nichols, testified that when he later asked petitioner about the fees petitioner first stated that his services were worth "around $500," but, when confronted with the $1,268.54 check, said he had forgotten it was that much. When confronted with the $3,450 withdrawal, he said that it was for legal services also. When asked if he thought a fee of nearly $5,000 was high for the services performed, petitioner stated that in his opinion the fees were perfectly justified.

After Nichols' death, a civil action was brought by Vandegrift as executor of the estate against petitioner for money had and received and for conversion, based on these transactions. The trial court found that all money given petitioner, except $335 for legal services, and $8.60 for costs expended on behalf of James Nichols, were obtained by fraudulent means, had not been returned, and awarded judgment against petitioner for $7,208.54. No appeal was taken.

The local administrative committee found that all money obtained from Nichols was obtained by petitioner wrongfully and corruptly, and was converted to his own use, and that petitioner thereby violated his oath and duties as an attorney as prescribed by sections 6067 and 6068 of the Business and Professions Code and committed acts involving moral turpitude, dishonesty, and corruption within the meaning of section 6106 of the Business and Professions Code. These findings were adopted by the board.

Petitioner urges that he appeared in propria persona in the civil action and put up a poor defense in that suit. He urges that the finding in that action that he had not returned the excess over the first deposit was not supported by the evidence, and that for that reason the judgment based thereon should not be used to support a finding of a violation of professional ethics. He argues that all the authorizations and the receipt were signed by Nichols, and the return of the money was witnessed by an independent witness.

Petitioner is, of course, correct in his contention that the findings in the civil action are not binding upon us in this disciplinary proceeding. It is also the law that this court is not bound by the conflict of evidence rule in reviewing recommendations of the Board of Governors of the State Bar. (*Black* v. *State Bar*, 57 Cal.2d 219, 222 [18 Cal.Rptr. 518, 368 P.2d 118]; *Rock* v. *State Bar*, 55 Cal.2d 724, 726 [12 Cal.Rptr. 857, 361 P.2d 585].) We may exercise an independent judgment on the facts. (*Browne* v. *State Bar*, 45

Cal.2d 165, 169 [287 P.2d 745] ; *In re Stafford,* 208 Cal. 738, 739 [284 P. 670].) But that does not mean that the findings of the trial court and the findings of the board should be disregarded. If they are supported by substantial evidence, they come to us with a strong presumption of validity.

The burden is upon one seeking a review of a recommendation of the board to show its findings are not supported by the evidence, or that its recommendation is erroneous or unlawful.

In this case the findings of misappropriation of a client's funds and fraud and deception, made by both the trial court and the board, are amply supported. It is true that petitioner can point to the evidence that the withdrawals were authorized by Nichols, and that Nichols signed a receipt for $6,285 allegedly returned to him. The claimed return of the money was confirmed by the witness Jean Grecco. But neither the judge nor the board believed this testimony, and under the circumstances here described, both were justified in their lack of belief.

In view of the evidence of the age and physical condition of Nichols, and the altered authorizations and receipt, the claim that petitioner was keeping most of the money in cash in his filing cabinet for Nichols' benefit, and the claim that petitioner repaid $6,285 in cash to Nichols are not worthy of belief. The whole transaction is permeated with the appearance of fraud. The original fee demand of $3,000 and petitioner's agreement to accept a limited fee of $1,268.54, which the trial court reduced to $335, demonstrate his guilt of serious overreaching in fixing the original fee, and his securing funds in excess of $7,000 shows his intention to use the client's monies for his own purposes. Jean Grecco, the socalled independent witness, was an employee of a travel agency in which petitioner had a partnership interest, and which failed during the period here involved. Petitioner admitted he did substantially no income tax work for Nichols, and that the only debt he ever paid for him was a small one for some vitamin pills. The authorizations to withdraw money were prepared by petitioner, and both of them contain false statements as to what was due petitioner. Under such circumstances, the findings of the board are amply supported and should be affirmed.

2. *Matter of Chakos*: Chakos was charged with assault with intent to commit murder. He employed petitioner

to represent him. Petitioner received $3,900 from the Chakos family, which he commingled with his own funds. The central question is whether $2,500 of this sum was earmarked for bail money or was fee money. The evidence is conflicting on this issue.

Chakos testified that when petitioner visited him at the jail on May 3, 1962, the day following his arrest, petitioner told him that he thought bail would be set at $25,000 (which would cost $2,500) and that he would need $800 or $900 more for attorney's fees; that Chakos suggested that he try to get $4,000 from Chakos' relatives in Chicago; that Chakos then called his mother in Chicago, and that both he and petitioner told her that he would need $2,500 for bond, and that $4,000 would be sufficient to cover incidental expenses also.

Petitioner testified that when he visited Chakos at the jail he had no idea of the amount at which bail might be set, and that he told Chakos that he wanted $4,000 in cash as a fee before starting on the case; that he told Chakos' mother over the telephone that the case would require $4,000; that the next day, May 4, 1962, he received $3,900 from Chakos' family ($100 had been sent to Chakos previously) and he told the bail bondsman that he would be good up to $2,500 for the bond premium; and that upon learning of the recommended bail the day of the preliminary hearing on May 15, 1962, but prior to the hearing itself, he offered to advance up to $2,500 out of his fees for the bond.

At the preliminary hearing, bail was set at $250,000 although the bail recommendation in the felony complaint filed on May 15, 1962, was only $25,000 plus a penalty assessment of $1,250. The bail was not met and Chakos remained in jail.

Petitioner then received a letter from Chakos' family lawyer in Chicago inquiring about the status of the case and stating their understanding that of the $4,000 sent petitioner, $2,500 was for the bail bond premium and $1,500 was for attorney's fees and costs (Chakos had owed petitioner at least $263.50 for his services in a prior divorce matter). In his reply letter, petitioner did not deny this fee arrangement or attempt to explain to the attorney his understanding of the arrangement.

On June 15, 1962, Chakos discharged petitioner, advising him that he had hired new counsel. Chakos wrote to petitioner on June 26, 1962, stating that he wished petitioner to

return the remainder of his money which he expected to be $3,400, but that if "they" did not agree on that, he was at least entitled to the unused bond money ($2,500).

On July 3, 1962, Chakos pleaded guilty to an amended information charging him with two counts of assault with a deadly weapon; he received a five-year probationary sentence and was released.

In a telephone conversation between Chakos and petitioner on August 22, 1962 (recorded by the Los Angeles District Attorney with Chakos' consent) petitioner told Chakos that he had $2,250 or $2,275 coming as a refund and that "that pays up the attorney's fee and the old bill," but said that he was "in a real bad spot" and would have to pay him in two or three installments within the next two weeks. Shortly thereafter, Chakos received one payment of $200, but no further payments were made, and petitioner denied owing Chakos any more money.

The local administrative committee found that the $2,500 was entrusted to petitioner for use in paying the premium on the bond, and that in commingling it with his own funds, appropriating it to his own use, and failing to return it upon demand of his client, petitioner wilfully violated rule 9 of the Rules of Professional Conduct of the State Bar and committed acts involving moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code. This finding was adopted by the board.

Petitioner urges that the most convincing evidence is to the effect that the entire $4,000 was a fee and not in part a deposit to be applied on a bail bond, that $4,000 as a fee was not exorbitant in light of the seriousness of the charge, and claims that since the complaint with a recommended bail of $25,000 was not filed until May 15, 1962, he could not possibly have any idea of what the bail would be when he visited Chakos on May 3, 1962. He explains his later offer of $2,500 toward the bail bond premium as a gratuitous offer on his part to use part of his fee for that purpose. He explains his telephone offer to return part of the money as a gratuitous offer made by him to refund part of his fee since the work on the case had been diminished by his dismissal.

While the testimony of petitioner supports such conclusions, they are not the most reasonable conclusions to be derived from the evidence. The testimony of Chakos is, of course, to the contrary. In addition when the Chicago family attorney in making inquiry of petitioner stated that he

understood $2,500 had been advanced for bail, petitioner did not deny this was the arrangement. The monitored telephone conversation with Chakos is not consistent with the idea that the entire $4,000 was intended as a fee. We think that the findings that petitioner has appropriated $2,500 entrusted him as a bail deposit are amply supported by the evidence and should be affirmed.

3. *Matter of Rawding*: Texaco, Inc., made certain claims against Dana Rawding based on certain charges incurred against her gasoline credit card. Dana employed petitioner to represent her in that controversy. Dana and Texaco, Inc., stipulated that a judgment should be entered against Dana for $886.23 on condition that execution should not issue if Dana paid off the judgment at not less than $30 a month. Thereafter, on July 5, 1962, petitioner entered into an agreement with Rodney Rawding, the sister of Dana, whereby he agreed, in exchange for a mink stole valued at $1,250, to assume Dana's debt to Texaco, Inc., to hold her harmless from any expense in connection with the judgment, and to consider all attorney's fees paid.

Petitioner failed to make the payments to Texaco, Inc. In December of 1962 petitioner had told an attorney for Texaco that he would make the payments and that the attorney could assure Dana of that fact. The payments were not made and the mink stole was not returned to Rodney Rawding. Petitioner did not warn Dana that he was not going to make the payments, and she was required to make them to prevent execution on her property.

Petitioner's explanation for this dereliction was that he was hard pressed for money in this period and that the travel agency in which he was interested failed and had to be closed in June of 1962.

The local administrative committee concluded that petitioner's conduct violated his oath and duties as an attorney in that it involved moral turpitude, dishonesty, and corruption within the meaning of section 6106 of the Business and Professions Code. The Board of Governors added the specific finding that the acceptance of the mink stole and the failure to pay the installments as promised were done wilfully with intent to defraud Dana and Rodney Rawding.

Petitioner urges that his conduct was not culpable because he failed to make the payments only because of a business failure. He points out that he received no cash fee for his services, and claims that at the time here involved he was not the attorney for either Dana or Rodney Rawding.

These contentions are not convincing. In view of the fact that the business failure occurred prior to the hold harmless agreement and the subsequent assurances of payment, petitioner must have known when he made the agreement that he could not make the payments. The fact a fee was not paid in cash does not mean he did not receive a fee. The mink stole, of greater value than the obligation petitioner assumed, was clearly payment on the fee. The fact that the fee did not come directly from Dana is of no moment; it was advanced on her account. ■ Moreover, an attorney's duty of honesty and fair dealing is not limited to dealings with his clients. (Bus. & Prof. Code, § 6106.)

■ The findings of the board should be approved.

■ 4. *Matter of Capranica*: In the spring of 1960, Jetty Capranica had employed petitioner on behalf of his sister Clara Capranica to effect collection of amounts due her on a promissory note. No fee arrangement was made, and all matters were handled between Jetty and petitioner. The note was assigned to Jean Grecco, petitioner's employee, for collection, and a judgment was recovered for $1,172.88, plus $160 for attorney's fees, $148.25 interest and $11.75 costs. The judgment was assigned to Clara Capranica and sent to Jetty with petitioner's statement that all amounts collected would be made payable to petitioner and Clara or to Clara only. On February 26, 1963, petitioner received $1,499.48 from a successful execution on the judgment.

Jetty testified that petitioner did not inform him of the collection; that he was informed by Brown, another attorney, that collection had been made; that when he contacted petitioner, petitioner admitted the money had been collected, but said he did not have the funds at the time and so would make arrangements for the payment.

In May of 1963, petitioner received a letter from Brown advising him that he was retained by Jetty and Clara Capranica to collect the amount received by petitioner from the execution and that since they had to hire other counsel they did not feel bound to pay petitioner for his services. Not until the preliminary hearing before the State Bar in September of 1963 did petitioner agree to pay $1,143 to Clara Capranica. He paid her that amount on October 5, 1963.

Petitioner testified that upon receiving the $1,499.48 he deducted $1,041.79 (after adding $100 which had been advanced by Jetty), which was comprised of the following amounts: $8 filing fee, $7.50 service of summons and com-

plaint, $1.00 execution charge, $160 attorney's fees, $390.29 one-third of the amount collected as attorney's fees, and $475 for services in connection with Jetty's auto business. Petitioner testified that he placed the remainder, $557.69, in his filing cabinet and that he informed Jetty of the collection the day after receiving the money but did not pay him because of continued disagreement with regard to his fee.

The local administrative committee found that petitioner converted the proceeds of the execution to his own use and refused to turn over the sums to his client upon request until preliminary proceedings were held by the State Bar. It concluded that petitioner thereby violated his oath and duties as an attorney as prescribed by sections 6067 and 6068 of the Business and Professions Code and committed acts involving moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code.

Petitioner contends that he was justified in withholding the funds because there was a legitimate dispute as to the amount of fees due him. His contentions are conflicting with respect to whom he was representing. He states in his first petition that he represented Clara Capranica but contends in his supplemental petition that in all proceedings he was given to understand that he was representing Jetty Capranica. Petitioner does not contend that he did not withhold the funds, but only that his action was not culpable. He further contends that there was no commingling since even though the amount collected was not placed in the trust fund used for his clients' funds, the funds therein were sufficient to cover that amount. Petitioner's arguments are not convincing.

It would seem that the withholding of his client's funds from February 26, 1963, to October 5, 1963, in the face of repeated requests for payment was unjustifiable and culpable conduct and that it could be inferred therefrom that he intended to misappropriate the funds to his own use. Respondent argues that petitioner knew that Jetty was acting as an agent for Clara; that it is the law that debts of an agent cannot be collected from the principal unless incurred in the scope of employment; that no fee agreement was ever made and a client's funds cannot be applied to fees without his agreement; that in admitting that he put the funds in his filing cabinet and not in his trust account, petitioner admitted a violation of rule 9 of the Rules of Professional Conduct; that where the charge is misappropriation of client's funds, the petitioner's noncompliance with rule 9 may be a

factor in determining discipline; and that restitution, particularly when made under pressure, is not a defense to charges of misappropriation, although the timeliness and manner of such restitution may have a bearing on discipline. These arguments are sound.

The local committee concluded that by reason of petitioner's conduct in each of the above cases he should be disbarred. The Board of Governors unanimously adopted the findings of the committee with minor changes and resolved by a vote of 14-to-1 that petitioner should be disbarred.

Upon reviewing the record it is our opinion that as to all four charges substantial, credible, and reasonable evidence and reasonable inferences from that evidence support the findings that petitioner misappropriated his clients' funds through fraud and deception. This, of course, is in violation of his oath and duties as an attorney at law. The acts involved moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code and warrant disbarment.

It is therefore ordered that petitioner, Thomas W. Lefner, be disbarred from the practice of law in this state, and that his name be stricken from the roll of attorneys, effective 30 days after the filing of this opinion.