[L.A. No. 30312. In Bank. Feb. 24, 1975.]

JOHN THOMAS TOMLINSON, JR., Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

568

## COUNSEL

Clarence S. Hunt and Gary D. Vestermark for Petitioner.

Herbert M. Rosenthal and Arthur L. Margolis for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (Board) that petitioner John Thomas Tomlinson, Jr., be disbarred.

Petitioner was admitted to practice in 1956, and has practiced continuously since that time in Chino. There has been one prior disciplinary proceeding against him.

By notice to show cause petitioner was charged in three counts with violation of his oath and duties as an attorney at law (Bus. & Prof. Code, §§ 6103, 6067, 6068); willful commission of acts of deceit, collusion, and improper receipt of money (Bus. & Prof. Code, § 6128); willful violation of rule 9 of the Rules of Professional Conduct;[1] and the commission of acts involving moral turpitude and dishonesty (Bus. & Prof. Code, § 6106). Pursuant to leave of the local administrative committee the notice to show cause was amended to add a fourth count. After a hearing the local committee found as to counts one through four that petitioner had been guilty of all of the charged violations except that relating to section 6128. The two-man majority of the local committee recommended that petitioner be suspended from the practice of law for a period of two years, such suspension to run consecutive to any other suspension then in effect, but that imposition of such suspension be suspended and petitioner placed on probation for two years, consecutive to any other probation then in effect, upon certain terms and conditions. The minority member recommended disbarment.

---

[1]Rule 9 provides as here relevant: "A member of the State Bar shall not·commingle the money or other property of a client with his own . . . ."

New Rules of Professional Conduct adopted by the Board of Governors of the State Bar were approved by this court on December 31, 1974, to become effective January 1, 1975. The adoption of such rules does not constitute a bar to a proceeding theretofore or thereafter commenced for an alleged violation of the Rules of Professional Conduct in effect prior to January 1, 1975.

Hereafter all references to the Rules of Professional Conduct are to the rules in effect prior to January 1, 1975.

Petitioner filed a conditional acceptance of the local committee's report pursuant to rule 38.5 of the State Bar Rules of Procedure, but the Board rejected it and ordered that the proceedings be reviewed. After the matter was argued and submitted, the Board unanimously adopted new findings as to all four counts. For purposes of determining the degree of discipline to be administered, it took into consideration the record in the prior disciplinary proceeding against petitioner (see rule 29.1, State Bar Rules of Proc.) in which, on May 17, 1972, he had been suspended from practice for one year, execution stayed with probation for three years on prescribed conditions. (Bar Misc. 3480.) By a vote of 12 to 2 the Board recommended that petitioner be disbarred. The two dissenting members were of the view that the degree of discipline recommended by the majority was excessive and that petitioner should be suspended from the practice of law for four years. We issued a writ of review pursuant to rule 952 of the California Rules of Court.

I

The facts as disclosed by the findings of the Board are in substance as follows:

*Count One*

Beginning early in 1967 petitioner represented Joseph Pedro in connection with two matters: the dissolution of his marriage to Mary Ann Pedro, and the dissolution and winding up of a partnership known as Pedro's Dairy in which Pedro, his wife, and his mother Mary Pedro were partners. In connection with these matters the assets of the partnership were liquidated and petitioner came into possession of various sums which belonged to Joseph. These he held as trust funds which he reflected in a ledger maintained by him. Furthermore, by agreement among all three partners and their respective counsel, petitioner was charged with, and accepted, the responsibility of acting as collecting agent for certain accounts receivable owed to the partnership and with the distribution to the partners of any sums collected.

Joseph Pedro was an admitted alcoholic. He placed great trust and confidence in petitioner and requested him to hold the money due him from the winding up of the partnership and to distribute funds to him from time to time when he requested. Although petitioner maintained a trustee account for clients' funds, he did not open a separate account for Joseph's funds but converted such funds to his own use. The balance in his trustee account was on numerous occasions substantially less than the

sum he was to hold for Joseph, and from time to time petitioner issued checks drawn on that account which were not honored due to insufficient funds. On one occasion petitioner issued a check to Joseph at his request which, when cashed by Joseph at a local tavern, was dishonored by the bank due to insufficient funds; the owner of the tavern attempted to collect the amount of the check directly from petitioner but was not successful in doing so until he filed suit against petitioner and Joseph and a bench warrant was issued when they failed to appear.[2]

On or about July 8, 1970, during the period in which petitioner was required to be holding funds for Joseph, the latter was arrested for and pleaded guilty to drunk driving. He was sentenced to a fine of $202 or, in the alternative, 30 days in jail. Petitioner was advised of the situation and informed that Joseph wanted him to pay the fine, but petitioner failed to do so until Joseph had spent 15 days in jail.

In September 1970 Joseph Pedro signed a written acknowledgement that he had been paid all of the funds due him. However, this acknowledgement was based wholly upon petitioner's representations to him; the record discloses that Joseph did not in fact know whether he had received a full and accurate accounting of his funds.[3] It is impossible to determine from petitioner's records whether all monies due to Joseph have been paid to him. It is clear that petitioner paid him no interest.

Pursuant to the aforementioned agreement among the partners in Pedro's Dairy and their respective counsel, petitioner collected an account receivable of some $1,300 owed to the partnership by the San Fernando Creamery. However, he did not maintain these funds in a trust account but converted them to his own use. He failed to remit pro rata shares to the other two partners in accordance with the agreement.[4]

### Count Two

Beginning in January 1966 petitioner repeatedly issued and delivered checks, some of which were drawn on his trustee account, which were

---

[2]The Board's findings state that a default judgment was obtained in this matter, but the record indicates to the contrary. The amount of the check, plus $25 interest, was paid to the tavern owner upon issuance of the bench warrant.

[3]Although the findings do not so indicate, it appears from the record that petitioner continues to act as Joseph's attorney and that the latter is personally satisfied that petitioner took no advantage of him. Joseph testified that in his opinion petitioner paid him all that was due.

[4]Although the findings do not so reflect, it appears from the record that the other partners were eventually paid or their claims satisfied by compromise.

returned to the payee for lack of sufficient funds. At the time of issuing or delivering such checks petitioner knew that there were insufficient funds in the account against which they were drawn.[5]

## Count Three

In or about November 1961 petitioner had borrowed approximately $17,000 from one Helen Ohmer Pennington, giving therefor his promissory note secured by a first deed of trust on certain real property owned by him. He defaulted in his payments and about February 6, 1970, received from the lender a notice of default and election to sell. Nevertheless, about February 24, 1970, petitioner leased the property subject to the deed of trust for five years to one Pierre Amouroux, for whom he had acted as an attorney and to whom he bore fiduciary responsibilities, collecting from Amouroux $400 as the first and last months' rent. Petitioner did not advise Amouroux of his default or the pending foreclosure. Nor did he cure the default and the property was sold, resulting in a termination of the Amouroux lease.[6]

## Count Four[7]

About February 1968 petitioner agreed to sell for $20,000 certain real property to Michel Irigoin and Pierre Lorda, for both of whom he had

---

[5]The record indicates that petitioner finally gave the bank his promissory note covering the overdrafts for which it had accommodated him pursuant to a previous oral agreement with the manager. The note was ultimately reduced to judgment which remains unsatisfied. Petitioner testified without contradiction that all of the obligations represented by checks returned for insufficient funds have been paid with the exception of two in the amount of $500 and $1,500 respectively, which were presented in purported partial payment of a secured note. (See *Count Four, infra.*)

[6]Although the findings do not so state, it appears from petitioner's uncontradicted testimony that two weeks after the sale Amouroux, having learned of the situation from another source, confronted petitioner at his office. "In fairness to" Amouroux, petitioner thereupon returned the $400 which he had received. (According to petitioner this was the only rent received.) Apparently Amouroux subsequently entered into an arrangement with Mrs. Pennington by which he continued as a tenant for an undisclosed amount of rent.

Neither Pierre Amouroux nor Mrs. Pennington testified before the local committee or the Board.

[7]As indicated above, the notice to show cause was amended to add this count in the course of the hearing before the local committee. Petitioner duly objected to this amendment on the ground of lack of adequate notice. However, it appears that petitioner had been made aware of the alleged facts relative to this count by the State Bar prior to its issuance of the notice to show cause. At the time of the amendment he was offered additional time to prepare a defense but refused it. The local committee did not abuse its discretion in accepting the amendment. (See rule 30, State Bar Rules of Proc.)

acted as an attorney and to whom he bore fiduciary responsibilities. Irigoin and Lorda made a down payment of $2,000, took possession of the property, and began to remodel it for a restaurant which they planned to open. Thereafter they paid petitioner eight monthly installments of $180 each, or a total of $1,440.

They never received title to the property. At the time of the purported sale the property was subject to a deed of trust in favor of one Mae Fisher securing a promissory note of a substantial amount. Petitioner was then in default in his payments on this note and knew that he could not pay it in accordance with its terms, which included a balloon payment of $25,000 in late 1969 or early 1970. He did not, however, reveal these facts to Irigoin and Lorda.[8] Ultimately, Mrs. Fisher gave notice of default and caused the property to be sold under the deed of trust. As a result Irigoin and Lorda lost the sum of $3,440 which they had paid.

### Prior Disciplinary Proceeding

As we have indicated above, the Board, pursuant to rule 29.1 of the State Bar Rules of Procedure, took into consideration the record in a prior disciplinary proceeding for purposes of determining the degree of discipline to be administered. The facts involved in that proceeding as disclosed by the findings of the Board in it are in substance as follows:

In 1965 Mrs. Barbara Morris, age 30, was left a widow by the accidental death of her husband. She had three small children at the time. She received some $34,000 as insurance death benefits, which sum was essentially the whole of her assets. Mrs. Morris had no business experience or training.

Since petitioner had been her husband's attorney, Mrs. Morris, in September of 1965, consulted him concerning the preparation of an affidavit of death of joint tenant. At that time petitioner was in difficult financial straits and knew or should have known that a federal tax lien had been filed against his bank account and real property assets for failure to pay employee withholding taxes. He also knew that he was not able to borrow from any other source.

In December 1965 petitioner borrowed $12,000 from Mrs. Morris, who made the loan on the basis of her reliance on petitioner's good name and

---

[8]It appears that the escrow instructions revealed the existence of the note and deed of trust, but Irigoin testified that he never learned, nor did petitioner ever advise him, of this fact.

integrity as a lawyer, his reputation in the community as a prominent and prosperous attorney, and his promise to provide adequate security. Petitioner gave her a note secured by a second deed of trust on certain property owned by him. The property was subject to a first deed of trust and was also subject to the aforementioned federal tax lien, but petitioner did not explain this to Mrs. Morris. Neither did he explain to her his precarious financial condition and the substantial risk involved in the transaction due to the vulnerability of the second deed of trust in the circumstances; Mrs. Morris did not understand the legal consequences of her position. Petitioner did not record the second deed of trust until January 1966, although he knew or should have known of the possibility of the intervention of other liens in the circumstances.

The first deed of trust on the subject property was foreclosed in 1970, and Mrs. Morris' second deed of trust proved to be worthless as security. In 1972, at the time of the disciplinary proceeding before the Board, a principal balance of $11,000 plus accrued interest remained due on the note, which was then unsecured. All of the foregoing constituted a breach of petitioner's fiduciary duties of fair dealing and full disclosure.

Pursuant to the recommendation of the Board, on May 17, 1972, this court ordered petitioner suspended from the practice of law for one year, execution of such suspension being stayed with probation for three years on certain conditions including the repayment of the amount due Mrs. Morris plus interest within two and one-half years.

## II

Petitioner contends that certain findings of the Board are incomplete and that the recommendation of disbarment is not warranted.

As to Count One petitioner contends that the findings are incomplete in that, among other things, they fail to properly reflect that his arrangement with Joseph Pedro included an understanding that petitioner was free to use Pedro's funds for his own purposes so long as he would distribute to Pedro the amounts requested by him from time to time. He also urges that the findings should have indicated more fully the fact that Pedro was completely satisfied with petitioner's treatment of him—such satisfaction extending even to the incident involving Pedro's 15-day sojourn in jail, which, viewed by Joseph in the healing perspective of time, was judged by the latter to have had a beneficial effect upon his character.[9]

[9]Pedro testified as follows before the local committee: "Q. Now, with reference to that

As to Count Two petitioner complains that the findings are deficient in failing to note that all but two of the obligations represented by checks returned for insufficient funds have been paid. The findings relating to Count Three, he urges, should have noted that Pierre Amouroux was not shown to have been harmed in any way by petitioner's failure to advise him of impending foreclosure proceedings relating to the property leased to Amouroux; we are also urged to direct our attention to petitioner's testimony to the effect that his failure to so advise Amouroux was motivated not by any bad intent on his part but by a personal conviction that he would be able to cure the default in one way or another. Similar considerations of motivation should have been evidenced by the findings relative to the Irigoin-Lorda transaction which is the subject of Count Four, petitioner argues.

After our full and independent examination of the record we have concluded that the findings of the Board, as summarized in the text of part I of this opinion and supplemented by the material there set forth by way of explanatory footnotes, represent a fair and complete statement of the facts relative to the charged offenses. Petitioner's expectations and motivations in dealing with clients, as well as the opinion presently held of him by such clients, are matters to be given full consideration in determining the proper measure of discipline to be imposed, but they have no place in establishing whether or not the offenses charged against him have been committed. It appears that all of the Board's findings have clear and convincing support in the evidence[10] and that taken together they state offenses justifying discipline. We thus turn to the question of the appropriate degree of discipline.

### III

"[T]he purpose of a disciplinary proceeding is not to punish the attorney but to inquire into the moral fitness of an officer of the court to continue in that capacity and to afford protection to the public, the courts and the legal profession. (*Hyland* v. *State Bar,* 59 Cal.2d 765, 774 [31 Cal.Rptr. 329, 382 P.2d 369]; *Best* v. *State Bar,* 57 Cal.2d 633, 637 [21 Cal.Rptr. 589, 371 P.2d 325]; *Resner* v. *State Bar,* 53 Cal.2d 605, 613 [2

incident, Mr. Pedro, do you have any feeling that Mr. Tomlinson abused any trust that you had in him in regard to your remaining in jail? A. No, I believe he done me good."

[10]Although petitioner in his opening brief makes a passing reference, undeveloped by relevant argument, to "several areas where the evidence was far from being clear and convincing," we do not deem this to constitute a serious contention that the findings of the Board are not supported by the evidence. For this reason we do not review the rules governing our consideration of such a contention. (See *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 793-794 [94 Cal.Rptr. 825, 484 P.2d 993].)

Cal.Rptr. 461, 349 P.2d 67]; *In re Rothrock*, 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226]; *Marsh* v. *State Bar*, 2 Cal.2d 75, 79 [39 P.2d 403].)" (*Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 151-152 [77 Cal.Rptr. 657, 454 P.2d 329]; see also *In re Fahey* (1973) 8 Cal.3d 842, 849 [106 Cal.Rptr. 313, 505 P.2d 1369]; *In re Higbie* (1972) 6 Cal.3d 562, 570 [99 Cal.Rptr. 865, 493 P.2d 97].) Looking to the combined record of this disciplinary proceeding and of the prior one against petitioner,[11] we are confronted not by a series of isolated acts but by a continuing course of serious professional misconduct extending over a period of several years. Petitioner essentially admits this; in fact he urges that we so consider his misdeeds, looking upon all of them as evidence of a lapse in professional responsibility from which he has now recovered. We have concluded that this is the proper approach to the question of the fitting degree of discipline in this case—although as indicated below we may differ with petitioner as to the overall seriousness of the course of conduct involved. To consider the acts involved in the four counts of the instant proceeding merely as evidence of a disregard of the suspended discipline given petitioner in the first disciplinary proceeding would be to ignore the fact that the acts embraced within the instant proceeding occurred almost wholly prior to the institution of the first disciplinary proceeding relating to Mrs. Morris. Thus, we believe that petitioner characterizes the matter accurately when he states that "the second proceeding was more of an updated hearing than an independant board of inquiry."

Taking this point of view, we are nevertheless met with a train of severe professional misconduct which on its face reflects a blatant disregard of professional responsibilities. The flagrant breach of fiduciary duties represented by petitioner's 1966 solicitation and receipt of an essentially unsecured loan from the widow of a deceased client we find to be not only a violation of his oath and duties as an attorney (Bus. & Prof. Code, §§ 6103, 6067, 6068) but an act involving moral turpitude (Bus. & Prof. Code, § 6106). The same must be said of his 1968 transaction with clients Michel Irigoin and Pierre Lorda *(Count Four)* which resulted in a loss of more than $3,000 to those men. The sorry history, extending from 1967 to 1970, of petitioner's treatment of Joseph Pedro and of his handling of monies due the latter from the Pedro family dairy, manifests not only repeated violations of the mandate against commingling found in rule 9 but also, in view of the suspiciously inadequate and disorganized bookkeeping practices of petitioner, smacks of misappropriation

---

[11]"As the ultimate purpose of a disciplinary proceeding is to determine the fitness of the attorney to practice law, . . . it would appear that a committee, or the Board of Governors, or this court might consider all matters properly before it, even though extrinsic to the instant record, in determining an attorney's fitness to practice." (*Resner* v. *State Bar* (1960) 53 Cal.2d 605, 613 [2 Cal.Rptr. 461, 349 P.2d 67].)

and conversion *(Count One).*[12] The same is true in respect to petitioner's failure to promptly account to the other two partners in the dairy for payments coming into petitioner's hands for the account receivable against the San Fernando Creamery *(Count One).* Petitioner's failure to disclose to client Pierre Amouroux in 1970 that a trust deed on property leased to him by petitioner was subject to imminent foreclosure, although insofar as the record shows it resulted in no financial loss to Amouroux, was clearly a violation of petitioner's duty of fair dealing and full disclosure *(Count Three).* Finally, petitioner's issuance of numerous checks over the entire period here in question, returned for insufficiency of funds *(Count Two),*[13] manifests an abiding disregard of " 'the fundamental rule of ethics—that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice.' " (*Alkow* v. *State Bar* (1952) 38 Cal.2d 257, 264 [239 P.2d 871].)

Petitioner offers several factors in mitigation. In his testimony before the local committee he described his "one man redevelopment program for downtown Chino," by which he referred to the fact that during the period in question (1966-1971) he owned no less than seven buildings in the downtown area, all of which were subject to purchase money notes and deeds of trust. This resulted in substantial and unwise financial overextension on his part and he ultimately lost all but one of these properties through foreclosure. It was during the period when the fact of this overextension was making itself manifest, petitioner testified, that all of the acts with which he is charged occurred. Moreover, during the period in question he practiced out of large offices with high overhead, employing at one point as many as eight clerical workers. At the present time, petitioner testified, he has moved from his former offices to one which he rents for $125 per month from his father. He has one full-time and one part-time secretary and he has cut his utility bills in half. He has tried to impose some organization upon his practice, including its record keeping aspect, instituting a computerized system for accounts receivable and initiating office procedures for insuring the balancing of all bank accounts.

---

[12]We have fully considered petitioner's contention that his arrangement with Joseph Pedro contemplated the former's use of the latter's funds for his personal use pending an eventual accounting. Even if the record sustained petitioner's version of the arrangement (we do not believe so), such an arrangement, at least of the informal species here alleged to exist, would in the circumstances be presumed the product of undue influence (Civ. Code, §§ 2219, 2235). In our view the showing here sought to be made through the testimony of Joseph Pedro has not dispelled that presumption.

[13]The record indicates that between 1966 and 1971 petitioner issued no fewer than 550 checks which were returned for lack of sufficient funds to cover them and that 28 of these checks were drawn upon trustee accounts.

Considerations such as the foregoing are highly relevant to our determination of the proper degree of discipline to be imposed in view of the function of these proceedings—which as we have indicated is not to punish the attorney but to inquire into his present fitness to continue as an officer of the court. (See *Demain* v. *State Bar* (1970) 3 Cal.3d 381, 387-388 [90 Cal.Rptr. 420, 475 P.2d 652]; *In re Higbie, supra,* 6 Cal.3d 562, 573.) We also note that petitioner had no disciplinary record prior to the two proceedings which we now consider. The fact that he was selected by his colleagues at the bar to be president of the county bar association in 1969 evidences the fact that he has enjoyed the respect and trust of his fellow lawyers[14]—although we must in all candor observe that he might better have reserved the energies demanded by that office for the requirements and responsibilities of his law practice. He has expressed a willingness to make restitution on the Morris and Irigoin-Lorda matters as soon as his continued law practice will allow him to do so and in accordance with any order of this court.

Petitioner urges that we should give great weight to the above factors in mitigation because the majority of the local committee, in recommending probation, obviously did so, citing to us the case of *Vaughn* v. *State Bar* (1973) 9 Cal.3d 698, 701 [108 Cal.Rptr. 806, 511 P.2d 1158]. ■ However, although the local committee's greater opportunity to observe and judge the credibility of the witnesses requires that great weight be given to their *factual* findings, it is the Board's recommendation in the matter of the appropriate degree of discipline which is accorded the greater weight. (*Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35].) In this case the Board, after essentially accepting the factual findings of the local committee and considering all of the aforesaid factors in mitigation, recommended by a vote of 12 to 2 that petitioner be disbarred from the practice of law.

■ After balancing and considering all of the aforesaid factors we are of the view that the discipline recommended by the Board is appropriate. As indicated above, we are here concerned not with an isolated act which can be deemed aberrant or out of character (cf. *Toll* v. *State Bar, supra,* 12 Cal.3d 824, 831) but with a course of conduct extending over a period of at least four years. (Cf. *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 560-561 [99 Cal.Rptr. 873, 493 P.2d 105].) That course of conduct can be characterized only as one evidencing a

---

[14]In this respect we must also note, however, a rather conspicuous lack of support for petitioner in the form of letters from his colleagues at the San Bernardino County Bar and others who might give favorable character evidence. The record before us, for reasons which do not appear, contains no evidence of this sort, either pro or con.

shocking readiness on the part of petitioner to place his own financial interests above the financial and personal interests of his clients. This consideration lies at the very heart of our determination, for as we have emphasized our function in a proceeding of this nature is to decide whether the attorney brought before the bar of this court for discipline has demonstrated through his deeds qualities which render him unfit for further service as an officer thereof. It is the protection of the public and the integrity of the legal profession which is here at stake, and when it is shown as here that those interests are endangered by the character of the attorney before us, our responsibility and duty require that we act in order to prevent that danger from bearing fruit in the form of future harm.

Although directed toward only one of the aspects involved in the instant case, we believe that the words of this court in *Resner* v. *State Bar, supra,* bear considerable relevance here. "The records here disclose an unrelenting indifference to the obligations of an attorney by deliberately commingling and diverting his clients' funds to his own uses and purposes. The violation of the trust which both the individual client and the general public repose in an attorney in the handling of funds entrusted to him is a most grievous breach of professional ethics and morality. An attorney who is shown to have embarked on a course of conduct during which such breaches become commonplace is not entitled to be recommended to the public as a person worthy of trust, and accordingly not entitled to continue to practice law." (53 Cal.2d at pp. 614-615.)

We emphasize that we have given full and careful consideration to petitioner's belief that in his present circumstances, with the pressures of financial overextension removed from him and the renovation of his office procedures and practices, he can function as an attorney in a manner commensurate with the public trust reposed in that office. However, as we stated in *In re Allen* (1959) 52 Cal.2d 762, at page 768 [344 P.2d 609], "the burden properly must rest on him to prove by sustained conduct over a period of years that not only his *belief* as to proper conduct for the future but his character, as well, has been established. His offenses, in our view, are of a nature which inherently call for disbarment. If and when petitioner can reasonably prove by showing a sustained course of conduct that he has attained a standard of character which entitles him properly to be accepted as a member of the State Bar of California, the law and the Rules of Procedure permit an application for reinstatement, upon good cause being shown and in the

discretion of the Board of Governors, after a lapse of two years from disbarment."

It is therefore ordered that John Thomas Tomlinson, Jr., be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is also ordered that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.