[L.A. No. 31438. Apr. 19, 1982.]

JOHN JOSEPH AMBROSE, JR., Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

[Bar Misc. No. 4198. Apr. 19, 1982.]

In re JOHN JOSEPH AMBROSE, JR., on Suspension.

**COUNSEL**

John Joseph Ambrose, Jr., in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Magdalene Y. O'Rourke for Respondent.

**OPINION**

**THE COURT.**—This is a proceeding to review the recommendations of the State Bar Court in two actions. In the first, the State Bar Court recommended that petitioner be disbarred. In the second, the State Bar Court recommended that he be suspended from the practice of law for five years on conditions of probation, including actual suspension of three years. Although the two matters were argued separately before the State Bar Court, it is appropriate to consider them together.[1] (*Fitzpatrick* v. *State Bar* (1977) 20 Cal.3d 73, 78 [141 Cal.Rptr. 169, 569 P.2d 763], and cases there cited.)

I.

Petitioner was admitted to the practice of law in California in June of 1967. He had no prior disciplinary action brought against him.

---

[1] The first proceeding, L.A. 31438, is based on numerous acts of misconduct by petitioner, including misappropriation of funds belonging to a client named Virginia Murphy. The second proceeding, Bar Misc. 4198, is based on petitioner's conviction of grand theft (Pen. Code, §§ 484, subd. (a), 487) of Murphy's funds. The two proceedings began at different times and were never consolidated before the State Bar Court. Since both involve petitioner's misappropriation of Murphy's funds, it is especially appropriate to review them together.

*L.A. 31438*

In the first action, the State Bar Court found that petitioner had engaged in misconduct as detailed in the following facts.

In July of 1976, petitioner agreed to represent Joseph Canchola on behalf of his minor son, Gilbert, in an action for personal injuries. Petitioner settled the action for $15,000 and received a settlement draft for that amount in November of 1976. He deposited the proceeds in his clients' trust account and withdrew $5,000 as his fee. However, he failed to pay the remainder to the Cancholas.

In March of 1977, petitioner issued a $10,000 check to the Cancholas. He asked the Cancholas not to cash it, informing them that it would be improper to pay them the funds before Gilbert's 18th birthday without a court proceeding. Petitioner promised to hold the $10,000 in an interest-bearing account until Gilbert reached majority age. He had no intention of fulfilling this promise. Beginning in March of 1977, petitioner misappropriated the Cancholas' funds and commingled them with his own.

Gilbert turned 18 years of age in September of 1977. Thereafter, petitioner issued a check for $10,300 to the Cancholas. The check included an endorsement condition stating, "Settlement including damages suffered due to tardy receipt of funds." In so doing, petitioner attempted to exonerate himself from and limit his liability for malpractice. He knew his account did not contain sufficient funds to pay the check, which was dishonored.

When the Cancholas inquired about their money, petitioner falsely told them that the reason for the delay in payment was that the settlement draft had not cleared. In fact, he had negotiated the draft in November of 1976. The Cancholas stated that they would complain to the State Bar or resort to their legal remedies. In order to prevent or stall the Cancholas' complaints, petitioner falsely told them in January of 1978 that they would receive their money in three days. He did not make restitution to them until the disciplinary and criminal proceedings were well under way.

In a matter involving a second client, petitioner agreed to represent Virginia Murphy in a civil cause of action. He settled the case, and in December of 1977 he received a settlement check for $7,000. He depos-

ited the check in his clients' trust account and received $2,500 in cash. He did not tell Murphy that he had received the check and he misappropriated and commingled a substantial portion of the funds. As in the Canchola matter, petitioner did not make restitution until the disciplinary and criminal proceedings had begun.

A third course of misconduct involved Joy Smithwick, who retained petitioner to represent her in an action for personal injuries. Petitioner was to receive one-third of any recovery. He filed a complaint in 1975. In April of 1976, the State Compensation Insurance Fund (Fund) intervened in the action. The Fund alleged that Smithwick's injuries arose from her municipal employment and that the Fund was entitled to recover benefits it was required to pay her. In August of 1976, without Smithwick's knowledge, petitioner agreed to represent the Fund for one-third of any amounts the Fund recovered. Petitioner's representation of the Fund was adverse to Smithwick's interests, since the amount she could recover might be reduced by what the Fund received.

After a trial, judgment for $35,000 was entered in Smithwick's favor. In October of 1976 and January of 1977, petitioner received drafts totalling about $35,760 in satisfaction of the judgment. Petitioner caused someone to endorse the drafts on Smithwick's behalf without her knowledge. Petitioner presented these drafts for payment with the knowledge that the endorsements were unauthorized. Smithwick and the Fund were not paid and petitioner misappropriated and commingled all or a substantial portion of the $35,760 he received.

In February of 1977, petitioner paid Smithwick $10,000, but told her that the remainder of the judgment proceeds had to be held in his trust account until resolution of certain claims by the Fund and the state pension system. Petitioner failed to work on resolving those claims despite Smithwick's request that he do so. In August of 1977, Smithwick asked petitioner for a written accounting of the judgment proceeds he had received. Petitioner failed to provide this accounting.

In May and November of 1977, petitioner misappropriated about $3,600 and $500 in settlement proceeds belonging to two other clients. As in the other instances of misappropriation, petitioner caused his clients' names to be signed on the settlement drafts without their knowledge, and he negotiated the drafts knowing that the endorsements were not authorized. In one of these cases, petitioner also misappropriated $800 which he had received on behalf of an insurance company.

In matters involving six other clients, petitioner failed to communicate with his clients, perform services, and return clients' files upon demand. In one of these matters, petitioner also filed an application for extension of time to file a tax return on behalf of a client without the client's knowledge. He thereby acted as her attorney without authority. In two cases, sanctions were imposed against petitioner's clients in their civil actions as a result of his failure to render services to them. Most of this misconduct occurred between November of 1976 and July of 1978. However, in one case, petitioner's failure to perform services began in May of 1973.

Petitioner also wrote a dishonored check for $500 to a client in December of 1977. He knew his funds were insufficient to cover the check. In January and April of 1978, he knowingly wrote two more dishonored checks for $30 and $54 in payment of clients' filing fees. He testified that he was able to write checks on insufficient funds because he had an informal arrangement with his bank that his checks would be honored and he would be told to deposit more money in his account. The hearing panel of the State Bar Court found petitioner's testimony to be contradicted by evidence of a pattern of issuing checks without sufficient funds, the nonpayment of some overdrafts, and the demeanor of petitioner when he testified.

Finally, petitioner became involved in a dispute with Don Lowry, the owner of the building where petitioner had his office. Petitioner agreed to vacate the office by January 31, 1978. Lowry then leased the space to another person as of February 1, 1978. On February 10th, petitioner was still on the premises. Petitioner promised to leave by February 14th and wrote a $360 check to Lowry. There were insufficient funds in his account to cover that check.

Petitioner did not vacate the office until March 2, 1978. He testified that he delayed the move because someone had been appointed by a court to take possession of certain property in the office, and, therefore, petitioner was prevented from entering the premises. However, the hearing panel found that petitioner's promise to vacate the office was false when made because he knew of the possibility that a keeper would be appointed. The panel also found that petitioner could have fulfilled his promise in spite of the presence of the keeper.

Petitioner and many other witnesses testified that petitioner had been an alcoholic when he engaged in this misconduct. Further, he had do-

mestic and financial problems. His first wife left him and their four children in 1971, and he had to raise them alone. He developed a drinking problem in 1973 or 1974. In 1976, the attorney who had been his partner in his law practice joined Synanon and left the office, taking half the library, furniture, and many case files with him. Petitioner's financial problems increased, and his alcoholism grew worse until he paid little attention to his practice. He began to "borrow" money from his clients' trust account, intending to return the funds when he received fees in other cases. As his fees declined, petitioner relied more heavily on the trust account to support his practice.

Petitioner stopped drinking completely in August of 1979. He attended weekly meetings of the State Bar program on alcohol abuse. He testified that he recognized that his alcoholism had harmed himself, his family and his clients, and that he is determined not to allow that to reoccur. He expressed remorse over his conduct and a desire to make restitution to all of the persons he victimized.

Several witnesses testified that petitioner's misconduct was an aberration caused solely by his alcoholism. He was described as an honest person and a capable lawyer. The witnesses also believed that petitioner would not get into trouble again because he was no longer drinking. Moreover, petitioner's family life had stabilized since he married his second wife in July of 1979.

Petitioner presented evidence on the issue of restitution. One of his lawyers, Matthew Segall, agreed in 1979 to loan petitioner enough money to make restitution to petitioner's clients. Segall later refused to loan petitioner the money. This refusal caused a delay in restitution. Petitioner's second wife then used her own funds to make restitution of about $22,000 to Joseph and Gilbert Canchola, Virginia Murphy, and other clients. Petitioner and his wife testified that their only other source of funds besides petitioner's practice was a parcel of land which petitioner would sell to obtain funds to make restitution to the other clients.

The hearing panel issued its decision in July of 1980. The panel was not convinced that petitioner had overcome his alcoholism. It was duly noted that petitioner had had a "slip" from abstinence as late as April or May of 1979. The panel found that although petitioner exhibited some remorse for the effects of his misconduct on himself and his fam-

ily, he showed neither a dedication to self-rehabilitation nor an appreciation of the harm he had caused his clients.

The panel also stated that petitioner was evasive in his testimony and had not made timely restitution. Finding that the gravity of petitioner's misconduct far outweighed the mitigating factors, the panel concluded that petitioner should be disbarred. In December of 1980, the review department of the State Bar Court (10 members) unanimously adopted the panel's findings of fact and recommendation of disbarment.

*Bar Misc. 4198*

The second State Bar action against petitioner concerned his conviction of grand theft.

In December of 1978, petitioner was charged with two counts of grand theft (Pen. Code, §§ 484, subd. (a), 487) and one count of issuing a check without sufficient funds (*id.*, § 476a). One grand theft count was based on petitioner's misappropriation of funds belonging to Virginia Murphy. The other two charges arose from petitioner's misconduct in representing Joseph and Gilbert Canchola. The facts underlying the Murphy and Chanchola matters as detailed *ante*, at pages 187-188, are part of the record in the first proceeding, L.A. 31438.

In November of 1979, petitioner pleaded nolo contendere to the grand theft count arising from the Murphy matter. The other counts were dismissed. In January of 1980, the trial court suspended the proceedings, imposed a probationary period of three years, ordered that petitioner pay a fine of $1,000, and specified several other conditions of probation.

As a result of petitioner's conviction of a crime involving moral turpitude, this court suspended him from practice, effective March 31, 1980,[2] pending a determination of the discipline to be imposed. (See Bus. & Prof. Code, § 6102, subd. (a).) This court referred the matter to the State Bar for a hearing, report, and recommendation as to discipline. (See *id.*, § 6102, subd. (c).)

---

[2]Petitioner had initially been suspended from practice effective August 31, 1979, but that suspension was vacated on November 5, 1979 when petitioner withdrew his plea of nolo contendere to grand theft. After petitioner again pleaded nolo contendere, this court reinstated his suspension effective March 31, 1980.

In April of 1981, a hearing panel of the State Bar Court found that at the time petitioner committed the grand theft, he was experiencing personal problems[3] and was a heavy user of alcohol. The panel also found that petitioner had made restitution of all sums. A five-year suspension was recommended with execution stayed, and five years of probation with conditions including actual suspension for three years beginning March 1, 1981.

In November of 1981, the review department (14 members) unanimously adopted the panel's findings. The department added findings that petitioner demonstrated candor, remorse, and insight regarding his actions. It found that he was developing control over his alcohol and overeating problems, was active in church functions, and was a highly intelligent person who would benefit the legal profession. The department, as did the panel, recommended a probationary period of five years with actual suspension for three years. However, the department recommended that the actual suspension begin on August 31, 1979.[4]

The review department noted that the subject of the conviction was already before this court in L.A. 31438. The department stated that substantial mitigating facts had been presented which were not in the record of L.A. 31438. Therefore, all eight members of the present department who had voted for disbarment in L.A. 31438 stated that they would now impose only a five-year probationary suspension with three years of actual suspension.[5]

## II.

■ Misappropriation of a client's trust funds warrants severe discipline, for it is a gross violation of professional ethics which undermines

---

[3]One of the personal problems cited by the hearing panel was that petitioner's son had committed suicide. However, the suicide occurred in 1980, after petitioner's criminal conduct in 1977 in the Murphy matter.

[4]The review department's recommendation would not result in a full three years of actual suspension, since there was a break of about five months (Nov. 5, 1979 to Mar. 31, 1980) in petitioner's interim suspension. (See fn. 2, *ante.*)

[5]In a letter to this court, petitioner contends that the recommendation of disbarment in L.A. 31438 should be disregarded because it is "superseded" by the recommendation of suspension in Bar Misc. 4198. However, the review department members' unofficial change of mind regarding the discipline in L.A. 31438 does not compel or even dispose this court to ignore the recommendation in that case. The recommendation was based on numerous acts of misconduct by petitioner which are not included in the Bar Misc. 4198 record. Thus, it is appropriate for this court to consider petitioner's misconduct as revealed in both L.A. 31438 and Bar Misc. 4198.

the public's confidence in the legal profession. (*Brody* v. *State Bar* (1974) 11 Cal.3d 347, 350 [113 Cal.Rptr. 371, 521 P.2d 107].) Where, as here, the attorney has been convicted of grand theft as a result of his misappropriation, disbarment is the usual sanction. (*In re Wright* (1973) 10 Cal.3d 374, 376 [110 Cal.Rptr. 348, 515 P.2d 292].)

Petitioner's misappropriation was of an aggravated nature. It occurred over a period of more than one year (Oct. 1976 to Dec. 1977) and involved five clients. The amounts petitioner took were large. With one exception, the amounts were over $3,600; one was $10,000 (the Canchola matter) and another was about $35,000[6] (the Smithwick matter). This repeated misappropriation of clients' trust funds warrants disbarment. (*In re Lyons* (1975) 15 Cal.3d 322, 326 [124 Cal.Rptr. 171, 540 P.2d 11].)

Petitioner accomplished his thefts of clients' funds through other dishonest acts warranting discipline. For example, he had his clients' signatures forged on drafts made out to them and he negotiated the drafts without his clients' knowledge. (See *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 798 [94 Cal.Rptr. 825, 484 P.2d 993].) In the Canchola matter, he repeatedly lied to his clients about the status of their settlement funds in order to conceal his misappropriation and to stall their complaints to the State Bar. This deliberate deceit was serious misconduct. (*Mack* v. *State Bar* (1970) 2 Cal.3d 440, 445 [85 Cal.Rptr. 625, 467 P.2d 225].)

Unfortunately, petitioner's misconduct did not end at misappropriation, forged endorsements on drafts, and fabrication. He also represented clients with conflicting interests without their consent (see rule 4-101, Rules Prof. Conduct of State Bar; *Lee* v. *State Bar* (1970) 2 Cal.3d 927, 941 [88 Cal.Rptr. 361, 472 P.2d 449]), and abandoned six clients, failing to perform services for them and to communicate with them (see *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 560-561 [99 Cal.Rptr. 873, 493 P.2d 105]). Further, petitioner engaged in misconduct by acting on behalf of one client without her authority (*Bodisco* v. *State Bar* (1962) 58 Cal.2d 495, 497 [24 Cal.Rptr. 835, 374 P.2d 803]) and by developing a pattern of writing checks with insufficient funds in his account (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 577 [119 Cal.Rptr. 335, 531 P.2d 1119]).

---

[6]Petitioner misappropriated about $10,000 in Smithwick's funds in October 1976 and another $25,000 in January 1977, but in February 1977, he returned $10,000 to Smithwick.

Petitioner was also dishonest in dealing with Don Lowry. This court may consider this dishonest act even though Lowry was not a client. (*In re Bogart* (1973) 9 Cal.3d 743, 749 [108 Cal.Rptr. 815, 511 P.2d 1167]; *Lefner* v. *State Bar* (1966) 64 Cal.2d 189, 197 [49 Cal.Rptr. 296, 410 P.2d 832].) Moreover, petitioner's misrepresentation to Lowry and his issuance of a dishonored check fit into a pattern of misconduct exhibited toward his clients.

Petitioner's misconduct was prolonged and serious. It occurred primarily over a period of about two years (Aug. 1976 to July 1978). In one instance, the failure to perform services occurred as early as 1973. However, despite the gravity of this misconduct, petitioner contends that the sanction of disbarment is too severe.

Petitioner points to the mitigating factors in the record. These include petitioner's lack of a disciplinary record (see *Prantil* v. *State Bar* (1979) 23 Cal.3d 243, 247 [152 Cal.Rptr. 351, 589 P.2d 859]) and his financial and personal problems at the time of his misconduct (see *Benson* v. *State Bar* (1971) 5 Cal.3d 382, 388 [96 Cal.Rptr. 30, 486 P.2d 1230]).

The hearing panel and review department in Bar Misc. 4198 also relied on findings that petitioner was candid and remorseful, that he made full restitution, and that he had been an alcoholic and was gaining control over his problem with alcohol. These findings are entitled to great weight, but this court may make different findings based upon an independent review of the record. (*Weir* v. *State Bar* (1979) 23 Cal.3d 564, 570 [152 Cal.Rptr. 921, 591 P.2d 19].) This court finds that the factors of remorse, restitution, and recovery from alcohol abuse are not as compelling as the State Bar found them to be in Bar Misc. 4198.

With respect to candor and remorse, the record supports the hearing panel's finding in L.A. 31438 that petitioner was evasive in his testimony regarding his issuance of checks on insufficient funds and his failure to vacate his office space as promised. This testimony indicated that petitioner was still attempting to justify his misconduct. Moreover, as the hearing panel in L.A. 31438 also found, petitioner's remorse focused on the harm he had caused himself and his family, not on the damage suffered by his clients. Petitioner's expressions of candor and remorse in the later proceedings in Bar Misc. 4198 are mitigating factors, but are not sufficient to alter the proposed discipline. (Compare *Bradpiece* v.

*State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337] [attorney expressed candor and remorse throughout disciplinary proceedings].)

Similarly, the fact that restitution was made is important but not decisive. Petitioner did not make restitution until 1979 or 1980, long after his misappropriation occurred (1976 to 1977) and the disciplinary and criminal proceedings began (1978). His reliance on his attorney to make restitution for him accounted for only part, if any, of the delay. His attorney did not promise to make restitution on his behalf until 1979. No attempt was made to sell a parcel of land petitioner owned to fulfill this obligation. Moreover, petitioner made no offers to repay his clients before the disciplinary and criminal proceedings began. Given these circumstances, it appears that petitioner may have made the restitution to his clients because he was concerned about the disciplinary and criminal proceedings against him. Thus, the making of restitution does not entitle petitioner to leniency. (*In re Lyons, supra,* 15 Cal.3d at p. 326; *Tardiff* v. *State Bar* (1971) 3 Cal.3d 903, 908 [92 Cal.Rptr. 301, 479 P.2d 661].)

The final factor relied upon by the State Bar in Bar Misc. 4198 was petitioner's alcoholism at the time of his misconduct and his success in controlling his habit. (See *In re Cohen* (1974) 11 Cal.3d 935, 943 [114 Cal.Rptr. 611, 523 P.2d 651].) Petitioner's efforts at self-rehabilitation are relevant to a determination of the appropriate discipline. (*Demain* v. *State Bar* (1970) 3 Cal.3d 381, 388 [90 Cal.Rptr. 420, 475 P.2d 652].) The testimony of his witnesses, who included judges and other attorneys, that his misconduct was out of character and that he is now fully competent to practice law is also noteworthy. (See *In re Jones* (1971) 5 Cal.3d 390, 401 [96 Cal.Rptr. 448, 487 P.2d 1016].)

However, petitioner's abandonment of a client as early as 1973, before he he began drinking heavily, casts some doubt on the testimony that his misconduct was purely an aberration. Further, petitioner stopped drinking only in August of 1979, just a few months before the final State Bar hearings in March 1980. Even then, a director of petitioner's alcohol abuse program testified that petitioner was initially uncooperative in the program. Although petitioner appears to have maintained control over his alcoholism up to November of 1981 (the date of the final proceedings of the review department), his good conduct has not been sustained long enough for this court to be satisfied

that his misconduct will not be repeated. (See *Tomlinson* v. *State Bar, supra*, 13 Cal.3d at pp. 579-580.)

Petitioner's misappropriation of tens of thousands of dollars in clients' trust funds, leading to a conviction of grand theft; his deliberate falsehoods; his negotiation of clients' drafts with knowledge that the endorsements were forged; his representation of conflicting interests; his abandonment of numerous clients; and his pattern of writing checks with insufficient funds manifest dishonesty and a disregard for his clients' interests. The serious nature of his misconduct must outweigh any mitigating factors. (See *Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186]; *Tomlinson* v. *State Bar, supra*, 13 Cal.3d at p. 578.)

## III.

█ The purpose of imposing discipline on attorneys is to protect the public and to maintain the integrity of the profession. (*Codiga* v. *State Bar, supra*, 20 Cal.3d at p. 796.) █ Because of the gravity of petitioner's misconduct, the public and profession will be insufficiently protected if he is merely suspended from the practice of law. The appropriate discipline is disbarment.

Should petitioner continue his present course of good conduct for an extended period of time, he will have support for an application for reinstatement to the State Bar. (*In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191].)

It is ordered that John Joseph Ambrose, Jr., be disbarred from the practice of law in this state. It is further ordered that he comply with rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. This order is effective 30 days after the filing of this opinion.