[S.F. No. 25098. Sept. 8, 1987.]

JOSEPH P. MALTAMAN, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Joseph P. Maltaman, in pro per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Andrea Wachter for Respondent.

## OPINION

**THE COURT.**—The State Bar Court recommends that petitioner Joseph Paul Gauci Maltaman, a member of the State Bar since 1955, be disbarred. The referree made findings, adopted by the review department, that from 1976 to 1985, in two separate matters, petitioner violated his oath and duties as an attorney and committed acts involving moral turpitude and dishonesty. He has no prior "formal" disciplinary proceedings.

The record generated by the State Bar Court suggests that substantial discipline is warranted, but it does not support the disbarment recommendation. Accordingly, we will impose a discipline of five years' probation, with a minimum one year of actual suspension, both contingent on petitioner's passage of the Professional Responsibility Examination and his full compliance with rule 955, California Rules of Court, as applicable during the periods of actual suspension and probation. A brief comment is warranted in connection with our decision to reduce the recommended discipline.

We must rely heavily on the State Bar Court's disciplinary findings and recommendations, and we do not hesitate to impose the suggested discipline when presented with a record which justifies it. However, this record, like others we are receiving with increasing frequency, leaves material gaps in the analytical path from charges to proof to findings and conclusions to recommendation.

Here, as in other instances (e.g., *Guzzetta* v. *State Bar* (1987) *post,* p. 962 [239 Cal.Rptr. 675, 741 P.2d 172]), neither the charges nor the ultimate findings and conclusions relate individual facts to specific professional duties and rules the State Bar Court concludes have been violated. Indeed, the instant findings and conclusions bear only a general relationship to the charges and proof; in several instances—some significant—conduct not charged, or not proved, is found and relied upon as a basis for discipline.[1] An important factual dispute which the State Bar Court was obliged to resolve de novo has been addressed in both the order to show cause and the findings only by a noncommittal reference to prior civil verdicts against petitioner. Assuming the State Bar Court thereby intended to adopt the civil findings, the evidence does not support them for purposes of attorney discipline.

As we recently noted, carefully prepared disciplinary records are essential to fulfilment by the State Bar and this court of our responsibility to ensure

---

[1] As we noted in *Guzzetta,* such imprecision "[n]ot only . . . make[s] the work of this court more difficult since we are forced to determine the basis for the recommended discipline by deductive reasoning, but it also brings into question the adequacy of the notice given to an attorney of the basis for the disciplinary charges. [Citations.]" (*post,* at p. 968, fn. 1.)

that practicing attorneys are competent and morally qualified. (*Guzzetta, supra, post,* at p. 968.) We call such problems to the State Bar's attention confident that, by doing so, we will prevent their recurrence.

Despite these difficulties, we uphold the State Bar Court's findings that, in one matter, petitioner willfully disobeyed important court orders and, in another, sought advantage for a client by attempting to mislead a judicial officer. Both are extremely serious breaches of an attorney's oath and duties. The valid findings also necessarily imply that petitioner lied on several occasions in the disciplinary proceedings. Indeed, he has exhibited disingenuousness and lack of candor throughout, showing little understanding of the seriousness of certain of the misconduct alleged, or of the role and duties of an attorney. Substantial discipline is therefore warranted.

Because the charges, evidence, findings, and conclusions are mismatched in a number of respects, each must be discussed separately and, unfortunately, in some detail. ■ In matters of evidence, we accord the State Bar Court's findings great deference, particularly when based on evaluations of credibility, but the findings are not conclusive here. We must weigh the evidence ourselves, resolving all reasonable doubts in the attorney's favor. ■ Petitioner bears the burden of showing the findings are not supported by the evidence, but he may satisfy it by demonstrating " 'that the charges . . . are not sustained *by convincing proof and to a reasonable certainty.*' " (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177]; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82], italics added.)

### THE NOTICE TO SHOW CAUSE

The notice to show cause (notice), filed September 4, 1985, included charges with respect to two incidents, the Spang and Dorham matters. In the Spang case, the notice alleged as follows: petitioner, in his professional capacity, advised Frances Spang concerning 1976 and 1977 holographic wills, and a 1976 joint tenancy deed, by which he acquired interests in her residence. He "failed to advise SPANG to seek independent legal counsel concerning the transaction and to get SPANG's consent in writing." After Frances died, he offered the holographic wills for probate. In the ensuing contest, a jury found on or about May 17, 1983, that the 1976 will and deed were procured by petitioner's undue influence, and the 1977 will by his fraud. All were set aside. On or about the last day of the trial, petitioner threatened the will contestant, Arnette Hubbard (Arnette), and later so

harassed her that she "filed a Petition for Injunction Prohibiting Harassment" against him. On or about June 15, 1983, petitioner telephoned Arnette's home and asked to speak to her though he knew she was represented by counsel.

By his actions in the Spang case, the notice (making at this point no reference to specific statutes or rules) charged that petitioner had (1) knowingly acquired an unfair and unreasonable interest adverse to a client without full disclosure or an opportunity for the client to seek advice from independent counsel, (2) failed to employ truthful means in a "[cause] confided to [him]" and sought to mislead a judicial officer by "an artifice or false statement of fact or law," (3) engaged in offensive personality, (4) attempted direct communication with a represented adverse party, (5) committed an act of moral turpitude, dishonesty, and corruption, and (6) violated his oath and duties.

In the Dorham matter, the notice alleged as follows: petitioner represented Gordon Dorham in a dissolution proceeding before Judge Kay. At a contested hearing on February 7, 1984, the court granted an interlocutory decree and made various oral rulings on support and visitation. After a posthearing conference to clarify the rulings, attended by both counsel, the court asked the wife's counsel, Christopher Cole, to prepare a written decree. Thereafter, petitioner submitted his own proposed order which he knew or should have known was inaccurate and slanted. Subsequently, petitioner appeared at a hearing on his "Motion to Conform Order to the Minutes." The court denied the motion as lacking legal basis, reprimanded petitioner for a pattern of deception, and granted frivolous-motion sanctions in the amount of $250, to be paid to Cole by petitioner personally and forthwith. Petitioner never paid the sanction.

Thereafter, alleged the notice, petitioner entered Judge Kay's courtroom during a recess in a criminal trial, while jurors and others were present. He approached a bailiff and demanded to see Judge Kay. When refused, he shouted, "Tell the judge that this courtroom is not his private boudoir" and hastily left the room.

By his actions in the Dorham matter, the notice charged (again without citation of specific statutes or rules) that petitioner had (1) displayed disrespect for the courts and judicial officers, (2) failed to counsel or maintain only those actions or proceedings he believed just, (3) employed untruthful means in litigation, (4) sought to mislead a judicial officer by artifice and false statements, (5) displayed offensive personality not required by the justice of his cause, (6) failed to give the obedience due in good faith to a

court order, (7) engaged in moral turpitude, dishonesty, and corruption, and (8) violated his oath and duties.

A separate section of the notice contained a general recitation that petitioner, by his conduct in both matters, had violated sections 6068, subdivisions (a), (b), (d), and (f),[2] 6103,[3] and 6106[4] of the Business and Professions Code, and rules 5-101,[5] 7-103,[6] and 7-105(1)[7] of the State Bar's Rules of Professional Conduct.

## THE SPANG EVIDENCE

Petitioner performed legal, business, and personal services for an elderly couple, Nick and Frances Spang. He maintained a relationship with Frances after Nick's death in 1973, and she came to depend on him heavily for

---

[2] Section 6068 provides in pertinent part that "[i]t is the duty of an attorney: [¶](a) To support the Constitution and laws of the United States and of this State. [¶](b) To maintain the respect due to the courts of justice and judicial officers. [¶] . . . [¶](d) To employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law. [¶] . . . [¶](f) To abstain from all offensive personality, and to advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which he is charged. . . ." Despite an allegation in the Dorham matter that petitioner "counsel[ed and] maintain[ed]" an "action or proceeding" without belief in its justice, the notice did not specifically charge a violation of section 6068, subdivision (c), which includes as an attorney's duty "[t]o counsel or maintain such actions, proceedings or defenses only as appear to him legal or just, except the defense of a person charged with a public offense."

[3] Section 6103 provides: "A wilful disobedience or violation of an order of the court requiring [an attorney] to do or forbear an act connected with or in the course of his profession, which he ought in good faith to do or forbear, and any violation of the oath taken by him, or of his duties as such attorney, constitute causes for disbarment or suspension."

[4] Section 6106 provides in pertinent part: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of [a lawyer's] relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension."

[5] Rule 5-101 provides: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

[6] Rule 7-103 provides: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body."

[7] Rule 7-105 provides in pertinent part: "In presenting a matter to a tribunal, a member of the State Bar shall: [¶](l) Employ, for the purpose of maintaining the causes confided to him such means only as are consistent with truth, and shall not seek to mislead the judge, judicial officer or jury by an artifice or false statement of fact or law. . . ."

companionship and assistance in all her affairs. In 1974, Frances formally executed a written will prepared by petitioner. It left the bulk of the estate to Frances' sister, Arnette, and Arnette's daughter Suzann Hubbard Edwards (Suzann), or alternatively to an educational trust for Suzann's minor son Shane Dunn. Petitioner was named trustee for Shane and executor of the will but was not a beneficiary.

Frances died on April 8, 1979. Petitioner did not offer the 1974 will for probate. Rather, he presented holographic wills executed by her on February 4, 1976, and March 15, 1977, both of which left Frances' house, the estate's most valuable asset, to petitioner.

Arnette and Suzann, represented by Attorney Teal, offered the 1974 will. Will contests ensued, and petitioner obtained appointment as special administrator of the estate. Arnette and Suzann sought his removal on grounds of self-interest. While deposing petitioner in that regard, Teal learned that in 1976, Frances had executed and recorded a deed naming petitioner a joint tenant of her residence.[8] Arnette and Suzann filed a petition requesting that the joint tenancy deed be set aside on grounds of fraud and undue influence, thus returning the residence to the probate estate. (Prob. Code, § 851.5.)

In January 1980, Judge Pfotenhauer entered an order which removed petitioner as personal representative for "possible conflict of interest," named Arnette special administrator, directed petitioner to file an account, ordered him to "deliver to ARNETTE HUBBARD all property . . . of the estate forthwith," and restrained him from "selling, hypothecating, [or] transferring any interest in" the Spang residence. In July 1980, Judge Ertola entered a further order clarifying petitioner's duty to turn over possession of "joint tenancy" property, including keys and deeds to realty. Petitioner did not comply with either order.

On May 17, 1983, Judge Marie-Victoire entered judgment on special jury verdicts in the consolidated probate action. The jury found that the deed and the holographic wills were procured through petitioner's undue influence, and that the 1977 holographic will was also procured by his fraud. The court ruled these documents void and admitted the 1974 will to probate.

Petitioner appealed the judgment, and in February 1984, the court set a stay bond of $60,500. (See Code Civ. Proc., §§ 917.4, 917.9.) Apparently petitioner never posted the bond.

---

[8] The deed was executed on February 27, 1976, 23 days after the first holographic will, and was recorded on March 19, 1976.

In late May 1983, apparently acting with court permission, Teal and Arnette retained a locksmith, Thomas Kokezak, who changed the locks on the house. Subsequently, Arnette found that her key to the new locks did not work and that they had been changed again. In early June 1983, petitioner sent Kokezak a "Demand to Surrender Possession Obtained by Forcible Entry."[9]

On May 25, 1984, Judge Arata entered a specific order directing petitioner "forthwith and immediately," and whether or not he received a written copy of the order, to "turn over to . . . HUBBARD [as administrator] any and all keys to the locks" of the Spang residence, to allow her "access and possession" to the home, not to enter or change any locks on the property, and to refrain from any acts which would prevent her from entering and using the premises. Notice of entry of the order was mailed to petitioner on July 24, 1984.

On December 17, 1984, Arnette noticed a motion to hold petitioner in contempt based on disobedience to the May 25 order. Supporting declarations by Arnette and Teal asserted that petitioner had installed tenants in the house as of August 1984. On February 27, 1985, after a hearing on January 31, Judge Wonder filed an order holding petitioner in contempt. The order again directed petitioner to transfer possession of the premises, and it also commanded him to turn over all rents received. If these requirements were not satisfied by February 4, 1985, petitioner was to pay the estate $100 in sanctions for each day until he was in compliance.

On June 20, 1985, Judge Wonder entered a second contempt order against petitioner, based on his continuing disobedience to the orders of May 25, 1984, and February 27, 1985. Specific findings were made that petitioner had personal knowledge of the prior orders, was able to comply with them, and had violated them willfully. Once again, petitioner was commanded to turn over possession, keys, and rents, and the $100-per-day sanction for noncompliance was continued. The court also directed issuance of a writ of possession for the premises to the special administrator. Hubbard regained possession only by rechanging the locks.

Petitioner acknowledged he had "refused" to comply with the 1980 orders insofar as they demanded surrender of the residence because he did not

---

[9] Arnette testified at the hearing that at one point she had to change the locks, then later found them changed again. There was no direct testimony as to the locksmith's identity, petitioner's demand to the locksmith, or the relevant dates. Certain of these particulars are derived from the special administrator's motion for a contempt order, dated December 17, 1984, and introduced in evidence as State Bar exhibit 23. A copy of the demand from petitioner to Kokezak is included as an exhibit to the motion. Petitioner disputes none of the facts recited.

consider them "valid and legal" to that extent. In petitioner's view, they were directed to him as special administrator, not in his individual capacity as surviving joint tenant, and covered joint tenancy assets not yet determined to be part of the probate estate. According to petitioner, Judge Ertola threatened to hold him in contempt for disobedience to the July 1980 order, but an order to show cause was never served "because the attorney that was assigned to prepare those papers informed Judge Ertola that the probate court has no jurisdiction over joint tenancy assets."

Similarly, petitioner testified, he ignored Judge Arata's *post*judgment order of May 25, 1984, on grounds it was directed to him as removed special administrator, not to the individual capacity in which he actually held title. "It is a matter of technicality," petitioner observed at the disciplinary hearing, "and law is nothing but technicality." However, at the time the estate sought contempt before Judge Wonder for disobedience to the May 1984 order, petitioner defended on grounds he did not then have possession of the premises, and "Judge Wonder admitted I could not be in contempt of court if I do not have possession." Petitioner asserts he was denied a trial to present this "nonpossession" defense fully, but that defense appears to be based merely on his installation of tenants during the intervening period.

Petitioner claimed he was again denied a trial at the second contempt hearing before Judge Wonder, but told the court he was attempting to evict the tenants. Finally, petitioner testified at the disciplinary hearing about a *third* contempt hearing of unspecified date. There, petitioner asserted, an unidentified judge found him *not* in contempt for failing to deliver possession and allowed him to be purged of contempt for rent arrearages, amounting to some $4,800, if they were paid within three days, "which was done." No records of this proceeding were introduced in evidence.[10]

The evidence of petitioner's fraud and undue influence upon Frances was highly circumstantial. At the civil trial (hereafter sometimes called trial), several of her relatives—Arnette, Suzann, the decedent's nephew Thomas Spang, and Thomas' mother Marie Page—testified to changes in Frances' behavior from 1975 onward. Though always reclusive, she had formerly relied heavily on these relatives to provide the companionship and attention she "craved." She would employ pretexts to get them to call or stop by as often as possible. After a time, however, and particularly from 1977 on, she began to hang up the telephone, refuse admittance when they stopped by,

---

[10]The Court of Appeal's unpublished opinion in the probate appeal supports petitioner's claim that he was purged of contempt. The court dismissed his appeal on May 29, 1985, when informed he was in contempt. Upon learning that "the contempt order which provided the basis for dismissing these appeals had been vacated," it granted a "rehearing" on January 17, 1986.

and decline to leave the house for outings or visits with them. When offered assistance in her personal affairs, she would respond that Mr. Maltaman, her lawyer, would take care of everything. On occasion, and sometimes tearfully, she would say that petitioner had control of everything, that she was afraid to speak to them since he was expected, and that she could not leave because he had a key and she feared she could not get back in.

While certain of these witnesses described Frances as weak-willed, nervous, fearful, neurotic, and easily manipulated by her loneliness, Page said she was strong-minded and stubborn.[11] Spang and Arnette also testified that Frances was not capable without assistance of using the language found in the holographic wills.[12]

Charles Vassallo, a real estate broker and notary public, testified at trial about the preparation and recording of the joint tenancy deed. Vassallo knew petitioner as a schoolmate in wartime Malta, and he agreed that the Maltese community in San Francisco is "tight." He further acknowledged that he had occasionally referred legal matters to petitioner when Maltese language ability was needed. However, Vassallo disclaimed any close social

---

[11] Noting Frances' reluctance in later years to talk to her before talking to her lawyer, Page did give her impression that Frances "was ascared of that guy [meaning petitioner]."

[12] The February 1976 will reads as follows: "This is my last will and testament. All other Wills I have made before do not count anymore. I Frances D. Spang in my right state of mind, I will my house at 200 Waterville Street with all the Household and my Personal things after I Die to Joseph P.H. Maltaman. He has been a Wonderfull Person and Dearest Friend to me I have ever had. He has taken care of me threw my grief and sickness. I leave the 10,000.00 dollars which Joseph P.N. Maltaman has as Trust for the education of Shane Dunn and Shad Edwards. [See discussion *post*.] He know what to do for these two boys. I leave 20,000.00 dollars and my stock to my Sister Arnette M. Hubbard and my Niece Suzann F. Hubbard one half to each if alive on my death. I leave 1000 dollars to the living Living Brother, Sisters', Nephews and Nieces of Nicholas Spang My Husband equal among them Joseph P.H. Maltaman will take care of my Funeral, of this Will, No bond, and will take the rest if any is left on my death. This is my Will and Wishes, in my own hand written, Signed and dated at San Francisco, Calif. where I was born."

The March 1977 will reads as follows: "If I should get sicker and weaker and I become unable to take care of myself and my business, I wish and order that my guardian and conservator shall be my Friend and Attorney Joe Maltaman and no one else, specially my sister because I know that Joe Maltaman will not put me in a home and I don't want to get out of my own home. In the chase I sure die I gave to my sister Arnette 5000.00 dollars, and to my niece I gave 5000.00 dollars, and to Jo Maltaman 10000.00 dollars for the schooling of Shane and Shad in college and each boy shall have 5000.00 dollars each for ther schooling in college and Jo Maltaman my friend and Attorney My house and all that is in it and my furnitor and my personal belongs, and jewlry and the rest of my proper. Jo Maltaman will take care of my funeral with Shur Co. 25th Mission and will take care of this Will as executor. I say again if Doctors don't believ sick and I need a guardian Jo Maltaman shall be the one with orders not to put me in a home and out of the house I gave to him. This written in and [illegible] my own hand today Tuesday March 15, 1977 at San Francisco."

or business relationship with petitioner,[13] and he denied any cooperation with petitioner in procuring the deed.

Vassallo testified he assumed Frances had simply selected him from among the neighborhood brokers in the telephone book. The deed was typed by Mary Akins, who worked in his office. Akins had previously worked part-time for petitioner and was a witness to the 1974 will; again, Vassallo denied any connection. Vassallo explained to Frances the consequences of joint tenancy. She insisted she understood and was acting according to her wishes. She was in a hurry to record the deed, and she pestered Vassallo to drive her to City Hall for that purpose. She appeared alert and oriented, though she seemed to need the support of others. She did not indicate that petitioner had advised preparation of the deed, but simply gave the impression she was on good terms with him.[14]

Specific evidence of petitioner's control over Frances' affairs centered around a $5,000 Bank of America savings account. In 1976, the names of Arnette and Suzann were removed from the account, and petitioner's name was substituted. Petitioner testified at trial that this was done for "convenience" so that he could write checks for emergencies such as sudden medical expenses.[15] After Frances' death, he initially listed the account as a probate asset, but omitted it in a subsequent accounting, apparently on the premise that as a joint tenancy asset it was not part of the estate. At trial, petitioner testified that it was exhausted to pay death expenses.[16] Petitioner also acknowledged the existence of a $10,000 trust fund for the education of Frances' grandnephews, Shane Dunn and Shad Edwards. (See fn. 12, *ante.*)

The evidence also discloses that Frances and her relatives had a long-standing dispute about where she should live. Arnette wished Frances to move into an adjacent mobilehome in Sebastopol; Frances desired Arnette to live with her in the San Francisco residence, which Arnette refused to do.

---

[13] On cross-examination by petitioner, who was acting as his own counsel, Vassallo disclosed that petitioner had represented Vassallo's *wife* in a dissolution proceeding which was never completed. In that capacity, according to Vassallo, petitioner "disrupted" a business transaction in which Vassallo was then engaged.

[14] At his deposition, portions of which were introduced at trial, Vassallo said he "gathered" petitioner had advised the deed. Vassallo said, "He does everything for her, the way she explained it. . . . She did say she liked him a lot. He was a good man, a very good man. She praised him."

[15] At his deposition in the civil matter, petitioner said the substitution was made because Frances "wanted to place herself completely dependent on me. . . . It probably wasn't necessary, except probably she wouldn't leave the house and wanted me to make some withdrawals for her. . . ." He described her in the deposition as "pathetic."

[16] In deposition testimony prior to the civil trial, petitioner claimed the account was a nonprobate asset and said that, while he never asserted ownership rights while Frances was alive, "[m]aybe I'll keep it."

From August 1975 through September 1978, Arnette wrote petitioner several letters urging his cooperation in getting Frances to Sebastopol. In September 1977, petitioner visited Arnette and Suzann in Sebastopol, and the three had an angry confrontation over the issue.

Petitioner testified at trial that shortly after Nick's death, Frances began calling him for companionship on the pretext of reviewing "important papers." He sought to limit his visits. He sometimes cooked for her. Petitioner testified he regarded his actions as charitable and saw Frances as a "nuisance," not a friend.[17]

Petitioner offered varying versions of his response to Frances' advice in early 1976 that she intended to give him the house. At trial, he said he did not tell Frances what "terms" to include in the will and advised her to contact another attorney. He gave the names of two neighborhood law firms which he believed he had recommended. He was then confronted with his deposition testimony. There he indicated he told her he did not want her to give him the residence, since any bequest or gift to him was sure to be contested in view of their lawyer-client relationship, and he did not wish to be involved. In the deposition, petitioner said he advised her to contact another attorney; when she asked, "Which attorney?" he told her to look in the telephone book. "I did not recommend any [specific] attorneys. Then she wanted . . . to make a deed. I said I would not prepare a deed for that purpose."

At the disciplinary hearing (hereafter sometimes called hearing), petitioner testified that he "dissuade[d] Mrs. Spang from bequeathing or executing a grant deed naming [him] as a joint tenant." At all times, he denied any participation, direct or indirect, in the drafting, execution, or recording of any of the challenged documents.[18] He claimed the 1977 holographic will was discovered only after Frances' death.

---

[17]There was evidence that, while representing her in an earlier wage dispute proceeding, petitioner had described Frances as "partially or completely senile." The wage dispute arose when petitioner stopped payment on Frances' check to a housekeeper, claiming she had been overpaid.

[18]At the hearing, petitioner testified that Frances had a property description for use in preparing the joint tenancy deed, since a deed already existed naming her and Nick as joint tenants. Petitioner said she asked him to prepare a deed substituting his name for Nick's, and he refused. Petitioner recounted that "when she showed me the first holographic will I [asked] her who helped you with this will, and who gave you the idea, . . . ." She responded that she had heard a radio talk by Mr. Dunbar, apparently an attorney, who said "that if she grants property during her lifetime to somebody, her relatives would never be able to contest it." Petitioner also reiterated at the hearing his claim that when she showed him the first holographic will, "I told her this will is going to be contested, and they will succeed." When she asked why she could not give the house to whomever she chose, "I told her I happen to be an attorney."

At trial, petitioner had mentioned Frances' continuing fear that she would be put out of her house and placed in a home. At the hearing, he testified that Frances "was indeed a lonely woman, and she did not forgive her sister for not coming down from Sebastopol to live with her."

Finally, Arnette testified at the hearing that on two occasions during the probate litigation, she encountered petitioner in the courthouse corridor. On each occasion, she asked to be allowed into the house to retrieve personal property. Petitioner responded that the house and everything in it was his, he had sold or given everything to the Salvation Army, and Arnette would enter only "over his dead body."[19] When she vowed she would not let him get away with it, petitioner "said he'd send his Maltese Mafia after me."

With respect to the Spang matter, the referee made specific findings, adopted by the review department, (1) that petitioner "did not, after acquiring knowledge of the [deed and holographic wills], advise [Frances] to seek independent legal counsel," (2) that a judgment was entered on special verdicts finding fraud and undue influence in the deed and wills (but *not* that the deed and wills had *in fact* been procured by fraud or that undue influence actually occurred), (3) that the two contempt orders were entered, (4) that "petitioner has consistently over the years 1976 through March 1986 disregarded, failed to comply with, and ignored legal, valid and noticed court orders and proceedings," (5) that petitioner "repeatedly refused to cooperate with the State Bar," and (6) that petitioner personally attempted to contact Suzann at home, knowing Arnette was represented by Teal and without Teal's consent.[20]

## THE DORHAM EVIDENCE

Gordon C. Dorham (Gordon) retained petitioner in a dissolution matter. Gordon's wife Ruthelle was represented by Attorney Cole. On February 7,

---

[19] Among the items never recovered from the house, Arnette testified, was $850 in cash Frances had kept for emergencies.

[20] This latter finding of unauthorized personal communication conforms generally to the charge that petitioner attempted such contact "[o]n or about June 15, 1983." The finding is supported by a citation to State Bar exhibits 5 and 6, which are the civil trial testimony of Arnette and Suzann respectively. Our examination of that testimony, however, discloses no evidence whatever that petitioner personally contacted Arnette's home *after* Frances' death and *after* Arnette had retained Teal to represent her in the probate matter. Both Arnette and Suzann testified to conversations at Frances' funeral and graveside service, and Arnette mentioned courthouse conversations, none initiated by petitioner. Arnette also said she received threats from a *female* caller on the day before the trial of the will contest began. (See discussion *post.*) These incidents, however, do not appear to be what the finding is describing. Nor, obviously, can the finding refer to petitioner's *1977* visit to Sebastopol, to which Arnette, Suzann, and petitioner all testified. That, of course, occurred long before Frances died, and cannot be the basis for a finding of unauthorized contact with a *represented adversary*. (See discussion *post.*)

1984, a contested hearing was held before Judge Kay in Department 28, early portions of which were reported but not transcribed.

In the transcribed portion, Judge Kay orally granted an interlocutory decree and made other oral rulings. After setting child and spousal support, he awarded joint legal custody of the couple's small son, Gordon, Jr., with physical custody in Ruthelle. Gordon was to enjoy out-of-home visitation rights as follows: (1) two hours every odd weekend upon 24 hours notice, (2) one additional hour, between 6 and 7 p.m., each 15th of the month, (3) once Gordon, Jr., reached three years of age, every Christmas, Easter, Fourth of July, Washington's Birthday, and Labor Day in even-numbered years, and every New Year's Day, Thanksgiving, and Memorial Day, and the child's and father's birthdays, in odd-numbered years, and (4) once Gordon, Jr., reached five years of age, all first and third weekends, from 6 p.m. Friday to 6 p.m. Sunday. No mention was made on the record about garnishments or assignments of Gordon's wages or benefits to satisfy support obligations.[21]

On March 9, 1984, a formal interlocutory decree, drafted by Cole, was filed. In addition to the matters expressly addressed in the transcribed portion of the February 7 hearing, it provided (1) that "[t]he present wage assignment shall remain in effect," as "modified to reflect these new Orders," (2) that "[t]he arrearages to be withheld shall remain at $100.00 per month until the arrearages are paid in full," and (3) that $650 "[o]f the money held by the Sheriff . . . after garnishing [Gordon's] Vacation Trust Fund" should be released to Ruthelle "to be applied towards the spousal and child support due for February 1984 and towards arrearages," with the remainder to be released to Gordon.

On March 15, 1984, petitioner noticed a motion entitled "Conforming order to and as announced." On the face sheet, Department 28 (Judge Kay's department) was typed in as the site of the hearing. Attached was a proposed "conforming" order. In the notice of motion, Gordon declared under penalty of perjury that except for an additional visitation day, Father's Day, which was "inadvertently omitted and not mentioned during

---

[21] Insofar as pertinent, the minutes of the February 7 hearing read as follows: ". . . Court grants interlocutory, no community property. Court orders joint legal custody; $200/month child support; $350/month spousal support for 1 year ending as of end of January 1985. Husband maintain health plan/other benefit plans. Plysical [sic] custody to wife; husband visitation rights - one or two hours every other weekend out of home; 15th of each month same basis from 6:00-7:00 p.m. When minor 3 years old even years following holidays: Christmas, Easter, 4th of July, Labor Day and Washington's Birthday; odd years - New Year's Day, Thanksgiving, [M]emorial Day, child's birthday and respondent's birthday. After 5 years of age, 1st and 3rd weekends starting Friday at 6:00 pm to Sunday 6:00 pm. . . . Attorneys' fees $2,500 total. . . . Direct judgment to be prepared."

trial," the attached proposed order "is the order made by this court after hearing as the same was pronounced from the bench immediately at the close of trial. . . ." The notice also asserted that the "[p]resent order is not supported by the evidence, & without trial thereon."

The proposed order differed from the judgment as filed by (1) adding Father's Day as a visitation day in all years (while omitting the father's birthday in odd-numbered years), (2) providing for full weekend visits to begin when Gordon, Jr., reached three rather than five, (3) including an annual summer visitation, commencing in 1989, and (4) omitting all references to the wage garnishment and vacation trust fund.

Ruthelle filed an opposition, and on April 4, 1984, petitioner filed a "response" on Gordon's behalf. There *petitioner* "declare[d]" on "personal knowledge," among other things, that his proposed judgment was "entirely supported" by the trial record and the court minutes except for addition of the Father's Day visitation, that "[t]he court deliberately and emphatically refused to make any ruling on wage assignment," and that he was "*not* seeking a new trial nor an order for modification." (Italics added.)

Petitioner's "response" included no typed reference to the department in which the matter was to be heard. However, the face of the filed document bore the handwritten notation "Dept. 13 4-6-84." Department 13 was the domestic relations department.

Apparently, both counsel appeared before Judge Grant of Department 13 on April 6. She reassigned the matter to Department 28, where it was heard by Judge Kay on April 19. Judge Kay sarcastically announced it as a "unique" motion, in effect an appeal to the court's clerk of the order pronounced and signed. He immediately demanded to know petitioner's "statutory authority" for the motion. Petitioner responded that it was a "commonsense" procedure necessary because the written judgment prepared by "my opponent" did not conform to the oral order.

Without permitting further argument, Judge Kay then delivered a heated lecture. Despite other pressing matters, he said, and though petitioner's motion had no statutory basis, both he and his clerk had carefully reviewed the minutes and the "verbatim transcript;" they found that "each and every separate order" in the proposal submitted by petitioner was "different than that which I have pronounced." The court suggested that petitioner's failure to type "Department 28" on his response caused the matter to be "naturally . . . misdirected" to Department 13. It deemed the proposed order "contemptuous," saying petitioner should "thank [his] lucky stars" that "I am not going to hold a contempt hearing." The motion was denied

"with extreme prejudice." The court advised petitioner that, though he was "entirely in the wrong here," his remedy was "to order a transcript and take an appeal, . . ."

At that point, the court curtly bid counsel "good afternoon," but Cole interjected a request for a ruling on his request for fees on a frivolous motion. As argument began, petitioner interrupted to complain about the court's use of the word "contemptuous" and asked why his client should now be subjected to the additional expense of an appeal. Judge Kay responded that he thought petitioner was "contemptuous by deliberately preparing a false order;" it could not otherwise be so inaccurate in every respect. The court said it had made petitioner's order, unsigned, "a permanent part of the files for anybody to look at."

The following interchange then occurred: "THE COURT: . . . If you'd like, I will cite you to the State Bar right now. [¶] MR. MALTAMAN: If you wish to do so, go ahead, Your Honor. [¶] THE COURT: I do so. [¶] MR. MALTAMAN: Because, Your Honor, I think I would like to take issue on the question that said I was contemptuous and I was wrong in every respect. [¶] THE COURT: All right. I do so. I cite you to the State Bar to such disciplinary proceedings as they may deem appropriate. [¶] MR. MALTAMAN: Which I would be very glad to face. [¶] THE COURT: All right."

The court granted Cole $250 in frivolous-delay sanctions, to be paid by petitioner personally pursuant to Code of Civil Procedure section 128.5. Petitioner then objected that the signed judgment wrongly garnished $650 from Gordon's vacation trust fund to be applied against arrearages in spousal and child support. Petitioner noted that the court "did not make any rulings" in that respect at the February 7 hearing. The court responded it had "specifically stated I was going to leave it alone." Petitioner agreed the court had said it "was not going to touch" the wage assignment but claimed again that no prior order supported the $650 garnishment. The court concluded the discussion by remarking that "[i]t would remain as it was, that's the only clear meaning you can put on those words, Mr. Maltaman. . . ."

At the disciplinary hearing, both Cole and Judge Kay testified that an unreported conference took place immediately after the February 7 reported hearing. Its purpose, they said, was to clarify portions of the court's oral ruling. Both stated that petitioner attended and that counsel took detailed notes. Petitioner denied he was present at the meeting.

Cole testified that the posthearing discussion included, in addition to the visitation issues, "something regarding a wage assignment that needed to be

clarified . . . , and some money that had been garnisheed from [Gordon's] vacation fund. [¶] Those things, the wage assignment and the garnisheed money had been done prior to the trial." Cole had not reviewed his notes of the posthearing conference before his testimony. Judge Kay simply asserted, without stating specifics, that petitioner's proposed judgment was "[not] consistent with the court's ruling."

There were sharp disputes with respect to the mixup between Department 13 and Department 28. Julie DeChavez testified she was a superior court clerk who in April 1984 worked in Department 13. Prior to April 6, she received a call from Judge Kay asking whether the Dorham case (i.e., petitioner's motion to conform) was set in Department 13. She checked and found it was; her own initial indicating such setting was on the face of petitioner's original motion papers, which did specify Department 28. Judge Kay confirmed to DeChavez that the matter should have been set in Department 28. DeChavez called petitioner to determine why the matter was in Department 13; petitioner indicated that "Judge Kay and Judge Grant [of Department 13] had already talked about it." From this, DeChavez inferred that petitioner wished the matter heard in Department 13. DeChavez called Judge Kay back and reported petitioner's response. She did not write "Department 13" on petitioner's response papers and did not know who had.

Cole testified that he received some notice to appear in Department 13 on the hearing date. The presiding judge in Department 13 then rerouted the matter to Department 28. Cole recalled a telephone conversation with petitioner prior to the hearing, but could not recall its contents.

Petitioner testified he received a call from Judge Kay's clerk, who said the matter was being rerouted to Department 13, since Judge Kay did not usually handle domestic relations matters. Later, DeChavez phoned to say it would not be heard in Department 13. Petitioner agreed but asked what would happen to the motion. DeChavez advised it would be taken off calendar rather than rescheduled. Seeking to avoid that result, petitioner suggested to DeChavez that he and Cole appear in Department 13, advise Judge Grant of the mixup, and obtain an order reassigning the matter. In a telephone conversation, Cole agreed to this procedure. Petitioner denied any knowledge about the "Department 13" notation.

Thomas Catchings testified he was Judge Kay's bailiff in late April 1984. He recounted the "boudoir" incident more or less as set forth in the notice. He indicated that he went into chambers to report petitioner's remark to Judge Kay; when they returned to the courtroom, petitioner was gone.

Petitioner's version of this incident emerges from his cross-examination of Catchings and his opening argument; he never directly testified on the matter. He sought to establish that he entered Judge Kay's courtroom only to examine records there; the bailiff approached him and told him he was not welcome because Judge Kay was still upset about "what occurred last week" (presumably the April 19 hearing). It was at this point, petitioner suggested, that he made the "boudoir" remark.

In the Dorham matter, the referee made specific findings, adopted by the review department, that petitioner was present at the posthearing conference; filed a proposed order "differing in many particulars from that ordered . . . and clarified by the Judge;" caused the matter to be misdirected to Department 13; "has intentionally wholly failed, refused, and neglected" to comply with the court's frivolous-sanction order; and made the "boudoir" remark "in a voice, manner, tone and loudness to be heard by others present." Also included was a conclusion that "[t]here is no statutory procedure, in law, to prepare and file a motion such as [petitioner's motion to conform]."

## DISCUSSION

In addition to its incident-specific findings, the State Bar Court also made general findings that petitioner had "repeatedly refused to cooperate with the State Bar," had committed acts of moral turpitude, and had violated Business and Professions Code sections 6068, subdivisions (a), (b), (d), and (f), 6103, and 6106, and rules 5-101, 7-103, and 7-105 of the Rules of Professional Conduct. Since the findings, like the charges, do not relate these rules and statutes to individual acts of misconduct, we must discern that relationship by deductive reasoning.

We infer the State Bar Court's conclusion that by (1) proffering the Spang deed and holographic wills, which he had procured through fraud and undue influence, (2) misdirecting the Dorham matter to the wrong department, and (3) offering a knowingly false order for signature in the Dorham case, petitioner violated sections 6068, subdivision (d) and rule 7-105(1) (both forbidding untruthful means in litigation or attempts to mislead judicial officers). We assume the State Bar Court concluded that by his willful failure to comply with court orders in both cases, petitioner violated sections 6068, subdivision (a) (requiring an attorney to support the laws and Constitution) and 6103 (forbidding bad-faith disobedience to court orders). It further apparently concluded that, by procuring the Spang deed and wills without directing Frances to independent counsel, petitioner violated rule 5-101 (governing the circumstances in which an attorney may acquire an interest adverse to his client).

The finding that petitioner attempted to communicate with Arnette during the will contest apparently is the basis for the conclusion that he violated rule 7-103 (forbidding such communication with knowledge that an adverse party is represented). The "boudoir" remark apparently prompted the determinations that he violated section 6068, subdivisions (b) (respect for courts and judicial officers) and (d) (offensive personality not required by justice). The general finding of moral turpitude, and the citation to section 6106 (moral turpitude as grounds for discipline), apparently refer to the deceptive and misleading acts, and the disobedience found with respect to both the Spang and Dorham matters.

Petitioner suggests that in numerous instances the evidence does not support the findings and conclusions. We agree that there are important evidentiary deficiencies.

■ The State Bar Court noted the civil determination that petitioner committed fraud and undue influence in the Spang case, but the civil verdict and judgment have no disciplinary significance apart from the underlying facts. While the civil findings bear a strong presumption of validity if supported by substantial evidence, we must nonetheless assess them independently under the more stringent standard of proof applicable to disciplinary proceedings. (*In re Wright* (1973) 10 Cal.3d 374, 377 [110 Cal.Rptr. 348, 515 P.2d 292]; *Lefner* v. *State Bar* (1966) 64 Cal.2d 189, 192-193 [49 Cal.Rptr. 296, 410 P.2d 832]; cf., *Bernstein* v. *Committee of Bar Examiners* (1968) 69 Cal.2d 90, 101 [70 Cal.Rptr. 106, 443 P.2d 570].)

■ We find that the evidence produced at the disciplinary hearing[22] fails to support claims of fraud and undue influence "by convincing proof and to a reasonable certainty." Petitioner concedes he had a confidential relationship with Frances. There is substantial evidence of her dependent nature, of petitioner's influence in her affairs generally, and of a suspicious disposition favoring him over her close relatives (though the family dispute over living arrangements may explain her decision). ■ However, a finding or presumption of undue influence (and, a fortiori, fraud) also requires *affirmative evidence* that the person accused *actively participated* in procuring the *specific document challenged*. (*Estate of Fritschi* (1963) 60 Cal.2d 367, 374 [33 Cal.Rptr. 264, 384 P.2d 656]; *Estate of Mann* (1986) 184 Cal.App.3d 593, 606-607 [229 Cal.Rptr. 225].)

■ Petitioner denied such participation at all stages, and any inference to the contrary is based only on speculation. Several witnesses testified

---

[22] The State Bar introduced excerpts from the civil testimony as its exhibits 2 through 7; the testimony of minor witnesses at the civil trial was not included. Additional live testimony was presented at the disciplinary hearing.

about Frances' statements that petitioner "had control" and that she feared him, but no one indicated she ever said that petitioner had participated, directly or indirectly, in either the handwritten wills or the joint tenancy deed. She insisted to the broker Vassallo, out of petitioner's presence, that she was acting according to her own wishes in executing the deed. She took a strong initiative with Vassallo in getting that matter accomplished. Though Vassallo's Maltese background is somewhat suspicious (Frances was not Maltese), he strongly denied any contact with petitioner in the matter.

Witnesses testified that the words used in the holographic wills indicated outside assistance, but our examination reveals no great sophistication in their provisions or grammar. (See fn. 12, *ante.*) The civil jury may have assumed, contrary to petitioner's testimony, that he would not give attention to someone he found "senile," "pathetic," and a "nuisance" unless he intended to obtain something in return. It may also have inferred that petitioner played upon Frances' well-documented fears of being forced from her home. Again, however, these are only conjectures.[23] We conclude that "convincing" and "reasonably certain" proof of direct participation in the deed and holographic wills is lacking.[24]

■ Petitioner also finds no proof that he violated rule 5-101, prohibiting the improper acquisition of interests adverse to a client. Again, the contention has merit. The State Bar Court indicates the violation consisted in failing to advise Frances to consult independent counsel when she told him

---

[23] One can only speculate on the basis for the jury's finding that the 1977 will was procured by fraud. We note that Frances' 1977 will nominates petitioner "and no one else, specially my sister" as her conservator should that need arise, "because I know that [petitioner] will not put me in a home and I don't want to get out of my own home." The will later repeats that petitioner "shall be the one with orders not to put me in a home and out of the house I gave to him." There was also evidence that during his 1977 visit to Sebastopol, petitioner begged Arnette to help him put Frances in a home. Perhaps the jury inferred that petitioner had thereby reneged on a promise to provide lifetime home care in return for title to the residence. There is, of course, no direct evidence of such a promise.

[24] In its unpublished opinion affirming the civil judgment, the Court of Appeal found sufficient evidence for the findings of fraud and undue influence. It ruled that the jury could infer petitioner's active participation in the deed and holographic wills from evidence that (1) he had prepared Frances' 1974 will, (2) she was utterly dependent on him in all her affairs, (3) she lacked the education to use certain words and phrases in the challenged documents, (4) Vassallo, the Maltese broker used to prepare the deed, was petitioner's boyhood friend, and (5) Vassallo "assumed" Frances was acting on petitioner's advice. Once the presumption of undue influence arose, said the court, the jury was entitled to decide whether petitioner's denials were an adequate rebuttal. The court applied the appellate-review principle that all facts are viewed most favorably to the prevailing party, "disregard[ing] the contrary showing." A close examination of the disciplinary record suggests the Court of Appeal overstated certain of the evidence against petitioner. In any event, as previously noted, "substantial evidence" to support the civil judgment is not necessarily "convincing proof . . . to a reasonable certainty," which we must find in order to impose discipline.

she intended to give him her house. The State Bar's suggestion that petitioner conceded the point at the civil trial is incorrect. In his civil deposition, petitioner said he "did not recommend any [specific] attorneys" but did advise Frances to *look in the telephone book* for another lawyer. At trial, he first said he recommended two specific firms, but after reviewing the deposition agreed, "Maybe that is correct, I did not recommend her to *any attorney, . . . .*" (Italics added.)

Of course, nothing in the letter or spirit of rule 5-101 requires the recommendation of *specific* lawyers. The rule wisely provides that the client be given the opportunity to consult independent counsel "of [his or her] choice." Specific recommendations by an interested attorney might well inhibit, rather than aid, the client's effort to obtain objective advice. We find no evidence that petitioner failed to afford Frances an opportunity for consultation with independent counsel.[25]

■ Further, as previously noted (fn. 20, *ante*), we find no support for the State Bar Court's finding that petitioner personally attempted to contact Arnette at home after she was represented by counsel. Neither the civil trial nor the disciplinary hearing included evidence to that effect.[26] Also entirely unsupported, so far as we can tell, is the finding that petitioner "repeatedly refused to cooperate with the State Bar" with respect to the Spang matter.

■ The State Bar Court found a long history of ignoring "valid and noticed court orders" in the Spang case, and that petitioner was twice cited for contempt in that matter. We must assume this evidence and finding

---

[25] Alternatively, petitioner suggests no duty arises under rule 5-101 when the attorney seeks to avoid all participation in the client's efforts to grant him benefits. The contention is plausible. The rule precludes a lawyer from "enter[ing] a business transaction" with a client or "knowingly acquir[ing] an ownership, possessory, security or other pecuniary interest adverse to a client" unless (1) the transaction is fair, reasonable, and fully disclosed in understandable terms, (2) the client "is given a reasonable opportunity" to seek the advice of independent counsel, and (3) the client consents in writing. While the "knowingly acquire" phrase is capable of broad application, at least two of the rule's requirements have little practical application to a situation in which the benefitted lawyer sought to avoid the transaction.

[26] The notice had also included a charge that petitioner *threatened* Arnette *during the trial* and *later* so harrassed her that she sought an injunction. Evidence was introduced at the disciplinary hearing that petitioner threatened during a courthouse confrontation to send "the Maltese Mafia" after Arnette (*ante* at p. 941), and that she responded by erecting locked stone gates and electric wires around her home. Arnette also testified that "[t]he day before I was to go to court I got a phone call and it was a lady, and she spoke broken English, an accent, and she says you do not go to court, and then she screamed 'or you're dead,' and she banged up the phone. . . ." (The record discloses that petitioner, born to Maltese parents, lived with his mother.) Petitioner does not deny either the "Maltese Mafia" threat or that injunctive proceedings occurred; he only suggests, disingenuously, that the State Bar did not introduce evidence of their outcome. Despite all this, the State Bar Court made *no* finding on the charge of threats and harrassment.

weighed significantly in the disciplinary recommendation. However, as petitioner points out, *the notice included no such allegations,* and he objected when counsel for the State Bar attempted to introduce evidence on the subject.

The State Bar's Rules of Procedure provide explicitly that "[t]he notice . . . shall cite the statutes, rules, *or court orders* alleged to have been violated, or to afford the basis for the action proposed, and shall specify in concise terms the *acts, omissions or facts* which constitute the alleged violation or violations, or the basis for the action proposed. . . ." (Rule 550, italics added.) Yet the rule also provides that "informality" in pleading shall be ignored. Even a "material" variance between pleading and proof may be cured by an amendment on "just" terms, and a variance shall not be deemed "material" unless it *"actually* misled the adverse party *to his prejudice* in maintaining his action or defense upon the merits. . . ." (Code Civ. Proc., § 469, italics added.)

When petitioner's objection to the evidence of his disobedience in the Spang matter was overruled, he sought no continuance to meet that evidence, but provided an explanation of his conduct through his own testimony. (See discussion, *post.*) Significantly, he does not claim he was prevented from presenting any other evidence or arguments in his defense, and he asserts no new evidence or arguments before us. Accordingly, there is no basis for a conclusion that he was "actually misled . . . to his prejudice" by any variance between the charges and the evidence. We do not condone imprecise charging in disciplinary cases and are sensitive to an attorney's claim that he was prejudiced by inadequate notice. However, we see no obstacle here to our consideration of the evidence and finding of petitioner's disobedience.

■ Petitioner next contends that his noncompliance did not violate the only prohibition he deems relevant, Business and Professions Code section 6103. That section authorizes discipline when an attorney disobeys a court order requiring him to do or forbear an act *"connected with or in the course of his profession,* which he ought in good faith to do or forbear, . . . ." (Italics added.) Here, petitioner urges, he acted as a private litigant. We agree there is no basis for the State Bar Court's finding that a violation of section 6103 occurred. Petitioner's noncompliance with orders directed to him as a *removed personal representative,* or as a claimant in possession, did not occur "[in connection with] or in the course of his profession" simply because he is a lawyer.

■ However, petitioner overlooks the State Bar Court's finding that he also violated sections 6068, subdivisions (a) and (b), and 6106 of the

Business and Professions Code. Section 6068 obliges an attorney to "support the Constitution and laws" (subd. (a)) and "maintain the respect due to the courts of justice and judicial officers" (subd. (b)). Under section 6106, *"any* act involving moral turpitude, dishonesty or corruption, *whether the act is committed in the course of his relations as an attorney or otherwise,* . . .* constitutes a cause for [a lawyer's] disbarment or suspension." (Italics added.) ▰ We conclude that, under certain circumstances, an attorney's disobedience, even when he acts in a nonprofessional or personal capacity, violates section 6068, subdivisions (a) and (b), and constitutes "moral turpitude" within the meaning of section 6106.

Not every act of disobedience which would violate section 6103 if committed while acting as a lawyer also constitutes a violation of the other cited sections when committed by an attorney in his private capacity. Otherwise section 6103's phrase "acts connected with or in the course of his profession" would be superfluous. But serious and fundamental obstructions of the judicial system the member has sworn to uphold, committed willfully and in bad faith, suggest a lapse of character and a disrespect for the legal system which bear directly on the attorney's fitness to practice law. (Cf. *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 220 et seq. [82 Cal.Rptr. 175, 461 P.2d 375].)

Of course, no attorney should be sanctioned simply for acting in good faith on a plausible claim of right. (Cf., *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].) Thus, noncompliance involves moral turpitude for disciplinary purposes only if the attorney acted in either "objective" or "subjective" bad faith. "Bad faith" is established if (1) no plausible ground for noncompliance existed, or (2) the attorney did not believe he had plausible grounds for noncompliance, even if such grounds arguably existed. (Cf., *Flaherty, supra,* at pp. 649-650.) ▰ The burden of establishing moral turpitude "by convincing proof and to a reasonable certainty" rests with the State Bar.

▰ Petitioner's noncompliance was "serious and fundamental" enough to support a finding of moral turpitude, assuming he acted in bad faith. The orders he ignored directed the transfer of estate assets to the decedent's personal representative and heir. Petitioner's persistent noncompliance produced no mere minor inconvenience in the litigation process. Rather, the predictable effect of his disobedience was to delay by years the possession of property of significant value by its rightful owners.

Petitioner urges, however, that most, if not all, of the orders he is accused of disobeying were technically invalid, relieving him of the duty to comply.

Such technical arguments are waived to the extent the orders became final without appropriate challenge. There can be no plausible belief in the right to ignore final, unchallengeable orders one personally considers invalid.

The State Bar Court cites a history of disobedience extending from 1976[27] to 1985. Nonetheless, it appears that the orders issued *before* the 1983 judgment setting aside the joint tenancy deed were beyond the probate court's jurisdiction and therefore void.

■ Probate jurisdiction, though limited, includes the power to remove personal representatives who claim interests in specific property adverse to the estate (Prob. Code, § 521 et seq.; see *Estate of Wemyss* (1975) 49 Cal.App.3d 53, 61 [122 Cal.Rptr. 134]; *Gross v. Needham* (1960) 184 Cal.App.2d 446, 462 [7 Cal.Rptr. 664]) and to adjudicate such claims (Prob. Code, § 851.5 et seq.; *Estate of Drucker* (1984) 152 Cal.App.3d 509, 511-512 [199 Cal.Rptr. 345] [joint tenancy claim]). However, we find no statutory or constitutional basis for an order that a removed representative, who possesses property under a claim that he is a surviving joint tenant, must nonetheless surrender the property to his probate successor before his claim has been adjudicated. ■ Under Probate Code section 851.5, where one claims ownership of property against a decedent's estate, a petition to resolve the claim may be filed by *either* the claimant or the administrator of the estate. A lis pendens (see Code Civ. Proc., § 409) may be recorded to disclose any such title dispute with respect to realty. That, rather than a forced surrender, appears to be the statutory means of preventing alienation until the dispute is resolved.

■ Moreover, the prejudgment "surrender" orders issued in the Spang case were nonappealable. Probate Code section 1240 lists the appealable judgments and orders of the probate court, and the list has long been deemed exclusive. (E.g., *Estate of Schechtman* (1955) 45 Cal.2d 50, 54 [286 P.2d 345].) An order directing a deposed representative to surrender property to his successor is not included.[28]

---

[27] It is difficult to discern what orders petitioner disobeyed in 1976 through 1979. The probate matter was not commenced until after Frances' death in 1979, and the orders mentioned in the record all date from 1980 onward.

[28] Among the orders made appealable by Probate Code, section 1240 are those "[g]ranting or revoking letters testamentary or of administration." (Subd. (a).) But this provision does not appear to encompass a subsequent order for surrender of assets. Section 1240 also permits appeal from an order "[i]nstructing or directing an executor or administrator" is appealable. (Subd. (*l*).) But this language relates to a statutorily limited proceeding, a *petition* for instructions made by the representative *himself*. (Prob. Code, § 588.) Finally, we are not concerned here with orders "[s]ettling an account of an executor or administrator" (*id.,* § 1240,

Thus, as to the prejudgment orders, petitioner's only review alternatives were to seek extraordinary relief or to raise the jurisdictional issue in contempt proceedings. There were no pretrial contempt proceedings, and we do not consider petitioner susceptible to a "bad faith" finding simply because he declined to seek extraordinary review of the orders. (But cf., ABA Model Code Prof. Responsibility, DR 7-106(A).) The record contains no evidence that petitioner actually lacked a belief in his legal right to ignore the prejudgment orders.

In its brief to this court, the State Bar focuses on the two *post*judgment contempt citations as grounds for the discipline recommended. The mere fact of a contempt citation is no ground for discipline of an attorney.[29] We agree, however, that the circumstances of petitioner's postjudgment noncompliance demonstrate "bad faith" disobedience which would warrant discipline.

Unlike the earlier orders, the postjudgment commands to surrender possession of the Spang residence were clearly within the court's fundamental jurisdiction over the parties and subject matter. With petitioner as an active litigant, the court had entered a final, self-executing judgment which directly entitled the special administrator to possession of the premises. (See Prob. Code, §§ 852, 853.) Since petitioner failed to post the stay bond set by the probate court, the judgment was not stayed pending appeal. (Code Civ. Proc., §§ 917.4, 917.9.)

The postjudgment "surrender" orders, like their pretrial counterparts, were nonappealable. (See Prob. Code, § 1240.) Petitioner *now* urges they were procedurally defective, again because they were not addressed to him in the correct capacity,[30] and because they did not constitute proper "writs of possession." (See Prob. Code, § 1230; Code Civ. Proc., §§ 712.010 et seq., 715.010 et seq.) However, so far as the record discloses, petitioner

---

subd. (k)), "[d]irecting . . . the payment of a debt [or] claim" (*id.,* subd. (m)), or "[d]istributing property" (*id.,* subd. (p)).

[29]Amendments to the State Bar Act in *1986* do, however, expressly require that the State Bar be *notified* of "any judicial sanctions imposed against [an] attorney, except sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000)." (Bus. & Prof. Code, § 6089, subd. (b).)

[30]This argument apparently stems from the fact that the order of May 29, 1984, drafted by Teal, is *captioned* "Order Compelling Suspended Administrator, and Further Orders of Court Instructing Personal Representative." Nothing else in this or subsequent orders suggests petitioner was being ordered to act only in his capacity as former representative of the estate.

never raised these points when twice cited for contempt. Instead, the defenses he claims to have presented were disingenuous and patently unmeritorious, suggesting his noncompliance did not stem from an actual good-faith belief in legal right.

Petitioner said he raised the defense of "inability" in the first contempt proceeding, which took place in January 1985. The implication was that he could not *then* turn over possession of the residence to Arnette because he had installed tenants who were currently in possession. But the May 1984 order he was accused of disobeying had prohibited him from doing just that; it commanded petitioner "forthwith and immediately" to turn over keys, allow Arnette "access and possession," refrain from changing locks, and avoid acts "of any nature, which would prevent [Arnette from obtaining] access to and use of" the property. The record contains no evidence petitioner lacked ability to comply with the terms of the May order *when it was issued*. In any event, he could not avoid contempt by willfully and fraudulently depriving himself of the ability to comply. (See, e.g., *In re Cardella* (1941) 47 Cal.App.2d 329, 330 [117 P.2d 908].) And he sought no review of the contempt judgment.

Similarly, petitioner testified he attempted to defend against the second contempt judgment, in June 1985, by showing that he had not yet been able to evict his tenants. Yet this defense patently ignores the terms of the order of January 1985, which underlay the second contempt citation. The January order did not require eviction of tenants; it directed petitioner to transfer "control and possession" *and to pay over rents previously collected*. There is no evidence petitioner ever lacked the ability to assign the lease or rental agreement and pay the arrearages. Again, he sought no review.[31]

Thus, the record supports the inference that any objections to the postjudgment orders now raised by petitioner, even if plausible, are afterthoughts, that he evaded the orders fraudulently, and that his noncompliance was in bad faith at the time it occurred. On this basis, the evidence warrants the conclusion that petitioner's postjudgment disobedience in the Spang case involved moral turpitude, as described in Business and Professions Code section 6106, and a disrespect for law and the judicial system, as proscribed by Business and Professions Code section 6068.

In the Dorham matter, the State Bar Court found and concluded that petitioner filed a motion not authorized by law, used deceitful means in

---

[31] Petitioner complains he received no full trial at either of the contempt hearings. The issue is waived by his failure to seek review of the contempt judgments. In any event, it is irrelevant to whether his noncompliance was in bad faith and thus constituted moral turpitude.

litigation, willfully disobeyed a sanctions order, and displayed offensive personality demonstrating disrespect for a judicial officer. Again, we must separate the wheat from the chaff.

It appears essentially undisputed that petitioner made an audible sarcastic remark about Judge Kay while standing in the judge's occupied courtroom, and that, apparently without excuse, he has never paid Attorney Cole the $250 in sanctions ordered by Judge Kay. The other issues are more complicated.

■ The conclusion that petitioner filed a motion without "statutory [basis] in law" is erroneous. Though petitioner has never supplied the statutory authority for his motion and has described the relief sought differently on various occasions, the motion itself indicates it seeks to conform the written judgment to the court's oral ruling and minutes. Whatever the merits of the request, it was authorized under Code of Civil Procedure section 473, paragraph 4, which permits the court, on motion, to "correct clerical mistakes in its judgments or orders as entered, so as to conform to the judgment or order directed,. . . ."[32]

■ The evidence that petitioner "caused" his motion to be misdirected away from Judge Kay is close. His original motion papers designated the correct superior court department, and there was no direct evidence he was responsible for the handwritten "Dept. 13" on the response. The finding seems based on DeChavez's testimony that, when asked to explain why the matter was calendared in Department 13, petitioner answered ambiguously that Judge Grant and Judge Kay "had already talked about it."

Petitioner presented a different version of the DeChavez conversation, saying he agreed the matter should go to Department 28 but proposed an initial appearance in Department 13 solely for purposes of rescheduling. Since neither version is corroborated, the dispute is one of credibility which the State Bar Court resolved against petitioner. We defer to that determination. Applying it, we find that petitioner's disingenuous, unhelpful, and apparently false statement to DeChavez supports an inference that he sought to exploit the scheduling confusion, however created. On that basis, we uphold the State Bar Court's finding, in effect, that petitioner deceitfully misdirected his motion to the wrong court department.

---

[32] In any event, we find puzzling the focus by both Judge Kay and the State Bar Court upon the allegedly "unauthorized" nature of petitioner's motion. A motion interposed in good faith could never be grounds for discipline simply on the premise that the motion was not then expressly recognized in law, or in statute.

■ The State Bar Court also found that, although present at both the contested hearing in the Dorham case and at a posthearing clarification conference, petitioner filed "a proposed order differing in many particulars from that ordered . . . and clarified by the Judge." The necessary inference (in view of the "deceitful means" conclusion) is that petitioner knew his proposed order was inaccurate and intended to mislead the court.

The visitation provisions of petitioner's order did differ materially from those orally pronounced at the reported hearing of February 7, 1984, and from the minutes of that hearing. However, the record leaves unclear what was discussed in untranscribed portions of the February 7 hearing and at the unreported posthearing conference. Before February 7, the court had apparently rendered interlocutory rulings on wage assignment matters. These were not mentioned in the reported oral rulings of that date, but, according to Cole, they were discussed at the subsequent unreported meeting. Attorney Cole's draft decree, signed by the court, referred to wage assignment matters, and in that respect *it* differed materially from the reported oral pronouncement. Petitioner's proposal eliminated the references to wage assignment; to that extent, petitioner's version conformed more closely to the oral pronouncement than did the signed judgment.

In his response to opposition to his motion to conform, petitioner declared that "[t]he court deliberately and emphatically refused" to rule on wage assignment issues. At the April 19 hearing, he and Judge Kay agreed the court had said it "was not going to touch" those issues. These remarks apparently occurred during some unreported discussion, and Judge Kay indicated he had meant that wage assignment "would remain as it was." But there is no direct evidence of the pre-February "status quo" on the issue. Judge Kay never specified on the record, either at the April 19 hearing or in the disciplinary proceeding, *how* petitioner's proposed judgment differed from the court's actual ruling. Attorney Cole had not reviewed his notes, and he had no independent recollection on the matter.

Under these circumstances, the judge's apparent unreported statement that he would not "touch" or "rule upon" wage assignment issues leaves room for interpretation about what result that ordained. The vacuum of information, in turn, also leaves open the question whether, off the record, the court also agreed—or petitioner believed it agreed —to the summer and weekend visitation terms he included in his order. To that extent, the record provides no clear basis for a finding that petitioner's proposal was a deliberate attempt to deceive.

On the other hand, petitioner's defense on the issue is typically and suspiciously disingenuous. In his motion to conform, and at the hearing on the motion, petitioner sought to buttress his position by describing prior statements of the court which both he and Judge Kay appeared to assume had been made off the record. Yet, in the disciplinary proceeding, petitioner excused any inaccuracy in his proposed order by stating he *did not attend* the unreported posthearing conference, a claim the State Bar Court specifically rejected after weighing his uncorroborated testimony against the contrary declarations of Attorney Cole and Judge Kay. Petitioner does not say that the judge's remarks were made in his presence at some other time. Moreover, petitioner caused his client to declare under oath in the "motion to conform" that the judgment therein proposed incorporated the court's order "as pronounced *from the bench*." (Italics added.) That statement is patently false. On balance, we deem the finding of deliberate inaccuracy established "by convincing proof and to a reasonable certainty."

## APPROPRIATE DISCIPLINE

■■■■ The issue of appropriate discipline is difficult. On the one hand, many of the facts and violations relied upon by the State Bar Court in recommending disbarment have not been validly proved. We find *no* "convincing" evidence that petitioner (1) procured a deed and holographic wills from Frances Spang by fraud and undue influence, (2) presented these documents in the Spang will contest with deceitful intent, (3) improperly failed to advise Frances to consult independent counsel, or (4) personally contacted an adverse represented party in the Spang case. We also see no basis for the State Bar Court's findings that petitioner disobeyed court orders over a *10-year period* and failed to "cooperate" with the State Bar.

Moreover, certain of the other misconduct alleged and found, while not to be condoned, would not warrant disbarment standing alone and does not appreciably support such a harsh recommendation even as a makeweight. Included in this category are petitioner's "boudoir" remark and his failure to pay the $250 sanction to Attorney Cole.

On the other hand, some of the remaining, validly shown misconduct is grounds for substantial discipline. In particular, we accept the State Bar Court's finding that petitioner used deceitful means, including presentation of a knowingly false order to a judicial officer, in order to obtain a litigation advantage in the Dorham case. ■■■■ Dishonest acts in court are a basic violation of an attorney's role, oath, and duties. (Bus. & Prof. Code, § 6068, subds. (a), (b), (d); State Bar Rules Prof. Conduct, rule 7-105.) We have

condemned such conduct in the strongest terms. (E.g., *Davis* v. *State Bar* (1983) 33 Cal.3d 231, 239-240 [188 Cal.Rptr. 441, 655 P.2d 1276]; *Olguin* v. *State Bar* (1980) 28 Cal.3d 195, 199-200 [167 Cal.Rptr. 876, 616 P.2d 858].)

▉ Additionally, petitioner's willful, bad-faith disobedience to a series of posttrial orders that he surrender possession of the Spang residence, even though committed as a private litigant, constitutes serious acts of moral turpitude and disrespect for the legal system bearing on his fitness to practice. (Bus. & Prof. Code, §§ 6068, subds. (a), (b), 6106.) There are strong inferences that petitioner testified falsely in several respects in the disciplinary proceeding. (See *Olguin, supra.*) And, though it proves no precise charge or finding, petitioner's "Maltese Mafia" threat to Arnette is cause for concern.

No mitigating circumstances are presented. ▉ Moreover, though lack of remorse is not an aggravating factor when based upon an honest belief in innocence (*Calaway* v. *State Bar* (1986) 41 Cal.3d 743, 747 [225 Cal.Rptr. 267, 716 P.2d 371]; *Hall* v. *Committee of Bar Examiners* (1979) 25 Cal.3d 730, 744-745 [159 Cal.Rptr. 848, 602 P.2d 768]), a failure to appreciate the gravity of conduct which is conceded, and a contemptuous attitude toward the disciplinary proceedings, are matters relevant to the appropriate sanction. (See *Alberton, supra,* 37 Cal.3d at p. 16.) ▉ Petitioner's lack of candor and disingenuous explanations for his conduct are evidence of such an attitude.[33]

The proven misconduct in this case is serious, involves moral turpitude, and is of the kind which undermines public confidence in the legal system. ▉ Even where deceit is involved, however, we generally have not ordered disbarment except where there is other serious *and habitual* misconduct. (See, e.g., *Chefsky, supra,* 36 Cal.3d at pp. 131-132; cf., e.g., *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 561 [99 Cal.Rptr. 873, 493 P.2d 105].) ▉ Because petitioner has no prior record of discipline, we have no evidence that a sanction short of disbarment is inadequate to deter future misconduct and protect the public. (See *Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131 [192 Cal.Rptr. 866, 665 P.2d 956]; *Warner* v. *State Bar* (1983) 34 Cal.3d 36, 43 [192 Cal.Rptr. 244, 664 P.2d 148].)

---

[33] By his own admission during questioning at the disciplinary proceeding, petitioner believes in a hypertechnical view of the law. One infers his perception that the legal system is simply a combat arena, where lawyers and their clients pursue selfish interests by maneuver and intimidation, asking and giving no quarter. Petitioner displays little understanding of the ethical standards applicable to his conduct of legal affairs.

Under all the circumstances, we conclude that the State Bar Court's recommendation of disbarment should not be followed, but that substantial discipline is appropriate. Accordingly, we order that petitioner be suspended from the practice of law for five years; that execution of suspension be stayed and petitioner be placed on probation for five years with actual suspension for the first year of such probation. Notwithstanding the foregoing, both the actual suspension and the period of probation shall continue until such time as petitioner has taken and passed the Professional Responsibility Examination given by the State Bar Committee of Bar Examiners. The remaining conditions of probation are that petitioner comply with all provisions of the State Bar Act and the Rules of Professional Conduct and with such other reporting and monitoring procedures as the State Bar may reasonably require. The periods of probation and actual suspension shall commence immediately upon the finality of this decision. Petitioner shall also comply with rule 955 of the California Rules of Court; the acts specified in subdivisions (a) and (c) of that rule shall be performed within 30 and 40 days, respectively, after this decision becomes final.

LUCAS, C. J.—I dissent. In my view, the record, despite its various shortcomings, amply supports the State Bar's unanimous recommendation that petitioner be disbarred.

I reject the majority's conclusion that, in the Spang matter, there is insufficient evidence to establish that petitioner exerted undue influence in the preparation of the two holographic wills and the joint tenancy deed. It is well settled that undue influence may be established by circumstantial evidence. (*Estate of Jamison* (1953) 41 Cal.2d. 1, 8 [256 P.2d 984].) Indeed, in cases such as this one involving a holographic and unwitnessed will, it is not surprising that there is no direct evidence of undue influence.

In the present case, several of decedent's relatives testified as follows: decedent was a lonely and impressionable woman who had depended on them a great deal until, suddenly, she began to spurn their attentions, either by hanging up the telephone when they called or by refusing to allow them entry into her house. She expressed her fear of petitioner, and said she was reluctant to speak to her relatives because she was afraid petitioner would discover that they had communicated with each other. Moreover, she tearfully said that petitioner had "control" over her. When asked to explain the comment she replied that she had done "something terrible," but refused to elaborate further. Moreover, she declined to leave her house because petitioner had refused to return her keys after she had given them to him so that he could feed her dogs while she was in the hospital, and she feared that he would lock her out.

Under these circumstances, I conclude the State Bar properly relied on the jury verdict in the civil matter. While we are not bound by findings in a civil action, "if the findings of the trial court and the findings of the [disciplinary] board are supported by substantial evidence they come to us with a strong presumption of validity. The burden is upon the one seeking review of the recommendation of the board to show that its findings are not supported by the evidence, or that its recommendation is erroneous or unlawful." (*In re Wright* (1973) 10 Cal.3d 374, 377 [110 Cal.Rptr. 348, 515 P.2d 292], citing *Lefner* v. *State Bar* (1966) 64 Cal.2d 189, 192-193 [49 Cal.Rptr. 296, 410 P.2d 832].) Here, in addition to the testimony of decedent's various relatives, the jury's findings are consistent with the evidence that the previous, witnessed will had bequeathed Mrs. Spang's property to her kin and that petitioner, who occupied a position of trust with regard to his client, was not the natural object of her bounty. In rejecting the civil findings, the majority places great reliance on the testimony of petitioner and on that of his boyhood friend, real estate broker Charles Vassallo. I, however, would not disturb the judgments of the civil jury and the hearing panel, which had the opportunity to assess the credibility of the witnesses as they testified. (See *Baranowski* v. *State Bar* (1979) 24 Cal.3d 153, 162 [154 Cal.Rptr. 752, 593 P.2d 613].)

In addition to the foregoing serious misconduct, as the majority notes, petitioner in bad faith failed to comply with various court orders related to the Spang action. Moreover, in the Dorham matter, he: (1) deceitfully misdirected a motion to the wrong court department; (2) deliberately presented the court with an inaccurate order; (3) made a sarcastic, and in my opinion a highly offensive, remark about Judge Kay; and (4) failed to pay $250 in sanctions imposed by the court. While individually these acts may merely warrant a period of suspension, I believe in concert they justify the sanction proposed by the State Bar.

The disbarment recommendation, moreover, is consistent with the State Bar's discipline guidelines which took effect on January 1, 1986. As we recently noted in *Greenbaum* v. *State Bar* (1987) 43 Cal.3d 543, 550-551 [237 Cal.Rptr. 168, 736 P.2d 754], even if misconduct predates the guidelines, they nonetheless may properly be considered to determine appropriate discipline. Here, petitioner committed acts which the guidelines indicate *shall* result in either suspension or disbarment, depending on the gravity of the wrongdoing. (Standards for Atty. Sanctions for Prof. Misconduct, stds. 2.3 & 2.6.)

To determine the gravity of the offenses in this case we must look to the aggravating and mitigating circumstances. As the majority concedes, there are no mitigating factors. The list of aggravating circumstances, however, is lengthy. Indeed, five of the six aggravating factors enumerated in subdivision (b) of standard 1.2 are present. Petitioner's misconduct involved "multiple acts of wrongdoing" (subd. (b)(ii)), as well as "bad faith" and "dishonesty" (subd. (b)(iii)). His undue influence in procuring the holographic wills and the joint tenancy deed "harmed significantly a client," and the "administration of justice" was likewise harmed by his repeated bad faith disobedience of court orders. (Subd. (b)(iv).) Moreover, inasmuch as petitioner's actions were either in bad faith or involved deliberate deception of judicial officers, his lack of remorse demonstrates "indifference toward . . . atonement for the consequences of his . . . misconduct." (Subd. (b)(v).) Finally, he "displayed a lack of candor" during the State Bar proceedings. (Subd. (b)(vi).)

My colleagues, I believe, place undue reliance on the fact that petitioner has no prior record of discipline. Where, in a case such as this, the acts of wrongdoing are numerous and serious, disbarment is justified despite the lack of previous disciplinary proceedings. (See *Bambic* v. *State Bar* (1985) 40 Cal.3d 314, 324 [219 Cal.Rptr. 489, 707 P.2d 862].) Accordingly, I would adopt the State Bar's recommendation that petitioner be disbarred.